## RICHARDS v. HUFF.

No. 14851—Opinion Filed Nov. 25, 1924.

### Wills—Validity—Appeal—Harmless Error.

Where a purported will is contested as a forgery and the findings of the trial court are sustained by the clear weight of the evidence, the case will not be reversed for errors and informalities occurring at the trial where it is not made to appear that the substantial rights of the complaining party were affected thereby.

(Syllabus by Ray, C.)

Commissioners' Opinion, Division No. 1.

Error from District Court, Stephens County; M. W. Pugh, Judge.

In the matter of the estate of J. C. Huff, deceased, Mrs. Eva Richards, proponent of the will, Mrs. Rebecca Huff, contestant. Judgment for the contestant, denying the will to probate, from which proponent appeals. Affirmed.

G. T. Burrows, H. Grady Ross, Womack, Brown & Cund, and Lillard & Edwards, for plaintiff in error,

Wright & Harris and E. H. Bond, for defendant in error.

Opinion by RAY, C. This appeal is by the proponent of the purported will of J. C. Huff, deceased, from the judgment of the district court of Stephens county refusing to admit the will to probate upon the ground that it was a forgery. A jury was impaneled and the court made the following statement:

"Gentlemen of the jury, the question that will be submitted to you will be as follows: (Q.) Did the deceased execute the will as claimed by the proponent thereof?

"That will be the question you will be called upon to decide."

The questions submitted to the jury, and their answers thereto, were as follows:

"We, the jury, duly impaneled, sworn and charged in the above entitled cause, do upon our oaths return the following answer to the following interrogatories, to wit:

"Interrogatory No. 1.

"Did J. C. Huff, on or about the 27th day of January, 1919, sign the will introduced in evidence before you?

"Answer: No.

"W. A. Samples, Foreman.

"Interrogatory No. 2.

"Did Joe Seymore sign the will purported to have been made by J. C. Huff, on the 27th day of January, 1919, as a witness?

"Answer: No.

"W. A. Samples, Foreman.

"Interrogatory No. 3.

"Did the deceased execute the will as claimed by the proponent thereof?

"Answer:

"_____, Foreman."

The court made the following findings of fact:

"And, now on this the 26th day of May, 1923, the court after due consideration of the verdict of said jury, finds as follows:

"That the protest of said Rebecca Huff is sustained by the evidence:

"That J. C. Huff, now deceased, was the son of the contestant and that she bore him the relation of his mother?

"That the said Rebecca Huff, contestant, is a beneficiary under a will established as the last will and testament of J. C. Huff, deceased, by judgment of the district court of Tom Green county, state of Texas, rendered on the 10th day of January, 1923, entitled 'In Re: The Estate of J. C. Huff, deceased' No. 4505, on the docket of said district court of Tom Green county, state of Texas, and that the said Rebecca Huff, is entitled under the laws of Oklahoma, to contest the instrument sought to be probated in this court.

"That said will involved in this case and purported to be executed by J. C. Huff, on the 27th day of January, 1919, is not executed and attested as required by law and is wholly void.

"That said will was not executed by the said J. C. Huff, now deceased, and is not the last will and testament of the said J. C. Huff, deceased, and that said will is not genuine and the court finds the issues tried in the cause in favor of the contestant, Rebecca Huff."

Then follows the judgment of the court refusing to admit the will to probate.

The subscribing witnesses to the purported will were Joe Seymore, whose address was given as Dallas, Tex., and C. E. Ryan, Ardmore, Okla., C. E. Ryan was produced by the proponent of the will as a witness. The absence of Joe Seymore was accounted for by showing that a diligent search had been made for him and that he could not be found. The only preson who had ever seen or heard of Joe Seymore, so far as the record discloses, was the other subscribing witness, C. E. Ryan, who testified that he met him at the time the will was signed, but had never seen him or heard of him before or since that time. The will offered for probate bears date of January 27, 1919. Ryan testified that he and Huff, the deceased, had been acquainted some 10, 12, or 14 years prior to that time. It appears from his testimony that during the time of their first acquaintance they were both gamblers; that they first became acquainted in Oklahoma City and afterwards met in different places for a few days at a time; had met and passed the time of day in Memphis, Dallas, Houston, and probably Galveston and Port Arthur. Ryan had quit gambling some 8 or 10 years and had located at Ardmore in September, 1918, where he had bought property and engaged in business. He had established a good reputation in Ardmore. He testified that he met Huff on the street in Oklahoma City on the morning of January 27, 1919; that they passed the time of day and Huff told him he wanted to see him and have a talk with him later. About 11:30 a. m. they again met near the Kingkade Hotel and Huff asked Ryan to go to his room with him. They went up to Huff's room, which was a southeast corner room on the third, fourth, or fifth floor. It is not made clear when Seymore went to the room, but after they had been in the room some five or

ten minutes, Huff told them that he had a document which he wanted them to sign. He then took the will out of his pocket, signed it, and asked them to sign as subscribing witnesses, which they did. Ryan did not know when Seymore left the room, but he and Huff stayed some two or three hours. After they had been in the room about an hour and a half Mrs. Huff, wife of the deceased, came in the room. Nothing was said to her in his presence about the will. After he and Huff had left the room Huff handed the will to the witness and asked him to keep it until it was called for. He and Ryan had not met for some two, three, or four years prior to that day, and Huff did not know until then that Ryan was living in Ardmore. Ryan took the will with him to his home in Ardmore where he kept it, part of the time in a roll top desk, part of the time in a trunk. Something like 18 months after the execution of the will Huff died at or near Duncan. Ryan saw an account of it in the papers. He tried to get Mrs. Huff over long distance telephone at one time but failed because she was sick, and he did not try to call her or get in communication with her again. Mrs. Ryan and Mrs. Huff were friends before Mr. and Mrs. Ryan were married. During the time between Huff's death and the production of the will for probate, about 18 months later, Mrs. Huff and Mrs. Ryan corresponded by mail, but nothing was said about the existence of a will. It is not made clear by the evidence whether Mrs. Ryan knew anything of the will.

A little over a year after Huff's death, Ryan was in Duncan and went to see Mrs. Huff, who at that time married a man by the name of Richards. Mrs. Richards told him of the trouble she was having about the estate and he then told her that he had, or knew, something that would do her good and told her of the will. She then went with him to Ardmore, where she stayed some two or three days, when he delivered the will to her, and she thereafter offerred it for probate. By the terms of this will all the property of the deceased, after payment of the debts and funeral expenses, was left to his surviving wife, Mrs. Eva Huff, the proponent of the will, now Mrs. Eva Richards. Mrs. Rebecca Huff, mother of the deceased, contested the will upon the ground that it was a forgery. Another will of the deceased, which made Mrs. Rebecca Huff, his mother, a beneficiary with his surviving wife, had been admitted to probate in Tom Green county, Texas.

In addition to the testimony of handwriting experts, considerable evidence was ad-

duced by the parties of a negative character. The register and other books kept by the Kingkade Hotel management were offered to show that Huff and his wife were not guests at the Kingkade Hotel at that time. The testimony of other witnesses was adduced by the proponent to show that Huff, deceased, sometimes stopped at hotels under other names than his own. Other witnesses also remembered that Huff and his wife were in Oklahoma City in January, 1919. They remembered it by reason of the fact that they were there to get remarried. They had lost their marriage certificate. The application for a marriage license issued by the court clerk of Oklahoma county and the marriage license, were offered in evidence bearing date of January 25, 1919. In connection with the testimony of the handwriting experts a photographic copy of the will offered for probate, and photographic copies of about forty signatures of the deceased, conceded to have been genuine, were offered in evidence. An enlarged photographic copy of the disputed signature and also enlarged photographic copies of two signatures of the deceased, conceded to be genuine, were introduced in evidence. All of these photographic copies are included in the record. The expert witnesses offered by the contestant were B. B. Hickman, J. C. Sherman, and Claude B. Scribner, all of whom had had long previous schooling and training in the line of detection of forged instruments. Mr. Sherman took up the study of questioned handwritings when a boy, following somewhat in the footsteps of his father. That appears to have been his entire business. The other experts for the contestant stood a very satisfactory cross-examination as to their qualifications. They had all given considerable time and attention to considering the questioned signature to the will, the authentic signatures of the deceased on checks and other writings, and the enlarged photographic copies of the questioned and authentic signatures with the aid of a microscope. Each of these witnesses pointed out in detail the distinctive features of the genuine signature upon which they reached the conclusion that the questioned signature was a forgery. Their conclusion was not arrived at because of any one of the differences pointed out but upon all of them. They conceded there was a similarity in the handwriting, and the principal distinctions pointed out were that all the genuine signatures appeared to have been written with greater rapidity than the questioned signature; that in the writing of Huff, in the commencement of the letter, the initial stroke was usually a fine line

indicating that the hand was in motion before the pen touched the paper. The genuine signatures were written rapidly and with decision while the questioned signature appeared to have been written with close attention to details, with a similarity in the pressure all the way through, not written with speed and freedom, but with short disconnected movements characterized by one of the witnesses as being in the nature of drawing, and without freedom in the making. The commencement of the letter appeared to be with the pen on the paper, unlike the sharp initial stroke used by Huff in writing his signature. They pointed out the number of breaks in the lines of the disputed signature in contrast with the strong, bold lines, without quiver or waver, in the authentic signatures. The disputed signature was characterized by some of the witnesses as being written with rather strong movement, instead of the free, bold hand used in the genuine signatures. In pointing out the peculiarities in the questioned signature that distinguished it from the genuine signatures, they referred to the loop in the "J", a peculiar curve in the "C", in all the signatures of Huff that were not in the questioned signature. Instead of the loop the initial stroke in the "C" was a straight downward line instead of the curve referred to; the difference in the cross line of the "H" and the difference in the connection with the "U" to the "H" in the genuine signature. It was pointed out that the "U" connected with the "H" while the enlarged photograph of the questioned signature showed the "U" to be disconnected. A number of other distinctions were pointed out not necessary to mention in this opinion.

The experts produced for the proponent were W. M. Massie, J. W. Felix, and W. A. Weaver. Mr. Massie was a banker of 20 years experience. He had had no training in distinguishing forged from genuine writing and had never made that a study, but after examining all of the signatures he was of the opinion that the questioned signature was the signature of Mr. Huff. He would have paid a check with that signature. Mr. Felix was an auditor who had been employed by Mr. Huff in keeping his books for about six months. He was familiar with Huff's signature and was of the opinion that the signature was genuine. Mr. Weaver had been studying the formation of letters and the question of the detection of forged writing for about 28 years and, for the last four or five years, had made a very close study of that question. He had read a number of authorities on that subject; was teaching penmanship; had

never been called as an expert witness in a case. He had devoted considerable time to considering signatures, questioned and genuine. He had called to his aid the microscope and had considered also the enlarged photographic copies. He was of the opinion that the questioned signature was genuine. His principal reason for thinking the signature was genuine was the way the pen was held and the general characteristics of the signatures. He pointed out the similarity in the formation of the letters, the distance between the initial letters, and the similarity of the downward stroke. He thought the pen was held in the same position in all the signatures and that was the most difficult thing to duplicate. He pointed out that no two persons held a pen exactly alike, and, by comparing the different letters, the slant and formation, he reached the conclusion that the pen was held in the same way. He pointed out that the pecularities in the handwriting were also characteristic of the questioned signature. He found breaks in the line of the genuine signatures similar to those pointed out by the other experts as characteristic of the questioned signature; that is, he found breaks in some of the genuine signatures. These breaks were accounted for by nervous, slow writing, which causes breaks or kinks in the line. He also pointed out the similarity of the shading.

There was considerable discussion by all the expert witnesses as to punctuation marks in the questioned signature, and also in some of the genuine signatures, from which different conclusions were drawn. The spacing between the letters was also considered and different conclusions drawn.

After considering all of the expert testimony, and examining the photographic copies of the questioned signature and the genuine signatures incorporated in the record, we think the testimony of the experts who thought the signature a forgery the more convincing. When that testimony is considered in connection with other testimony in the case, and the circumstances surrounding the execution of the will, its custody, and the manner of its being kept, and the long delay of the custodian of the will in notifying the wife of the deceased of its existence, the conclusion is forced upon us that the findings of the jury and of the trial court are sustained by the clear weight of the evidence.

It is contended by the proponent that no order was made submitting the interrogatories to the jury as required by law; that

the answers made by the jury amounted to a general verdict, and that the findings of fact made by the court showed upon their faces to have been based upon the verdict of the jury and were not independent findings of the court. We are unable to agree with these contentions of counsel, but, if it be conceded that the court erred in these particulars, it is not made to appear that such errors in any way affected the substantial rights of the proponent.

The judgment should be affirmed.

By the Court: It is so ordered.