## In re CREGER'S ESTATE.
## BROOKS v. CREGER.

No 17996. Opinion Filed Jan. 29, 1929.

Erwin & Erwin, for plaintiff in error.

Streeter Speakman and H. M. Jarrett, for defendant in error.

HALL, C. This is a contest in the proceedings to probate a purported holographic will of one M. Creger, deceased. The contest is by a daughter, an heir at law of the deceased.

Creger died in January, 1918, at nearly 70 years of age. At the time of his death and for several years prior thereto he was the owner of 320 acres of land situated in this state. He had four children. In the year of 1913, he made a will devising and dividing this land equally in acreage among them. This will was never properly acknowledged before witnesses, and it is conceded that it was not admissible to probate. However, he kept the will among his important papers, just as if the will were a legally executed document. That will is not the subject of this controversy. The will in controversy here is purported to have been executed wholly by M. Creger's own hand on April 7, 1917.

This purported will arranged the division of this land as to two of his children the same as the devise in the former and incomplete will. As to another of his children, Mrs. Louisa Brooks, the contestant, she was disinherited, and what would have been her share under the former document and the statutes of descent, was given or devised to his son. Harry, the proponent of the will here under contest. Harry was given one-half of the estate.

There existed some indebtedness against this land, and it seems that it was the desire of M. Creger. the deceased, that his children keep up these small periodical payments. Mrs. Brooks, the contestant, never contributed to these payments, but the others

apparently made one or more of these payments consisting of about $65 each.

The deceased at all times was on friendly terms with all his children. During the last years of his life he was in feeble and declining health. The year preceding his death he spent a considerable portion of the time with his son, Harry, the proponent of the will, and with his daughter, Mrs. Brooks, the contestant. He was staying at the home of the contestant up until two days before his death.

Harry testified that the will was executed while his father (M. Creger) was staying at his home near Comanche, Okla., and that during the execution of the will he read a portion of the document. Another witness, not incompetent to testify to the transaction, testified that on or about that date she saw the deceased writing something which he said, after its completion, was his will. This testimony is somewhat vague, and materially conflicts with much of the testimony of the witness Harry Creger.

The remaining brother and sister of Harry and Mrs. Brooks testified that the will was in the handwriting of their father; and that their father at one time had expressed an intention of not devising any of the land to his daughter, Mrs. Brooks. This testimony, however, is exceedingly meager and indefinite. Two or three other witnesses, apparently with no interest in the controversy, testified that the proffered will was in the handwriting of the purported testator, M. Creger.

On behalf of the contestant, two disinterested witnesses testified that just before the death of M. Creger he made statements to them in substance that he intended that his children should share equally in his land.

The will was found by the wife of Harry Creger, and found in a small satchel at Edmond in a room which was kept there by Harry Creger. After the death and burial of the deceased, Harry Creger sent his wife from where they lived in Southern Oklahoma to Edmond to look for the will, and she found it. The other facts in the case will be related further in the opinion.

Of the numerous questions presented, we need to discuss only four, namely: (1) The effect of admitting evidence of oral declarations of the deceased, or testator, concerning his intentions relative to the disposition of his property in his will or at his death; (2) the effect of admitting over the objections of the adverse party testimony of the proponent of the will and a beneficiary therein, when such testimony went to the question of the execution of the document; (3) the province of this court on review of a judgment admitting or denying a will to probate; and (4) whether or not the weight of the testimony supports the finding and judgment of the court. This brings us to the vital question—Whether or not the will or purported will was the handiwork of M. Creger.

In proceedings to probate a will, there is considerable conflict in the authorities on the question of the admissibility of declarations of the deceased as to his wishes and intentions concerning a testamentary disposition of his property, even in a contest where the issue is the execution of the will.

A majority of the text-books on the subject, and even that valuable treatise on the law of wills, Cyc. vol. 40, pp. 1311-1314, states that the general rule is that such evidence is not admissible. This language, however, implies that under certain conditions such evidence may be received. Plaintiff in error cites this text, and also the leading case committed to this doctrine, which is Throckmorton v. Holt, 180 U. S. 552, 21 Sup. Ct. Rep. 474, 45 L. Ed. 663. The Throckmorton Case holds that the declarations of the testator, both antetestamentary and posttestamentary, are not admissible to prove or disprove the making of a will. A large number of the cases are in accord with this doctrine.

Perhaps a majority of the earlier cases are in harmony with the Throckmorton Case. Perhaps on account of the prestige of the Supreme Court of the United States, the case of Throckmorton v. Holt doubtless overshadowed for a time the decisions of the state courts, which took the opposite view. Recently, however, the case has not been followed to any great extent, and we believe now that it is against the great numerical weight of the authorities, as well as it is against reason and the natural rule of relevancy. In re Thompson's Estate (Cal.) 253 Pac. 697; Estate of Thompson (Cal.) 198 Pac. 795; Estate of Sweetman (Cal.) 195 Pac. 918; In re Estate of Morrison, 198 Cal. 1, 242 Pac. 939; Hoppe v. Byers, 60 Md. 381; Adams v. Ristine, 138 Va. 273, 122 S. E. 126; Samuel v. Hunter's Ex's, 122 Va. 636, 95 S. E. 399; Maxwell v. Ford (W. Va.) 136 S. E. 777; Atherton et al. v. Gaslin et al., 194 Ky. 460, 239 S. W. 771; Baird et al. v. Schaffer et al. (Kan.) 168 Pac. 836, L. R. A. 1918D, 638; In re Johnson's Estate (Wis.) 175 N. W. 917; In re Bailey, 180 N. C. 30, 103 S. E. 896; State v. Ready, 78 N. J. L. 601, 75 A. 564, 28 L. R. A. (N. S.)

240; Aldrich v. Aldrich, 215 Mass. 170, 102 N. E. 487, Ann. Cas. 1914C, 906; Ewing v. McIntyre, 141 Mich. 517, 104 N. W. 787; Managle v. Parker, 75 N. H. 143, 71 Atl. 637, 24 L. R. A. (N. S.) 180, Ann. Cas. 1912A, 269; Swope v. Donnelly, 190 Pa. 417, 42 Atl. 882, 70 A. S. R. 637; Johnson v. Brown, 51 Tex. 65.

For a long period of time, California held to the doctrine announced in the Throckmorton Case, but, during the last decade, in several well-considered and exhaustive opinions on the point, the highest court of that state has definitely committed itself to the opposite view. The California cases cited above announce and illustrate its present rule. The case of Maxwell v. Ford, supra, was a case involving the question of whether a purported holographic will was genuine. In the course of the opinion the court said:

"In one of Freeman's notes, 107 Am. St. Rep. 461, that celebrated annotator, in discussing holographic wills, says:

" 'While the law sanctions them, it leaves them dependent on the opinion of witnesses as to whether the will is wholly in the handwriting of the testator, and where there is evidence on both sides of this issue, it would appear that declarations of a testator tending to either strengthen or weaken the probability that the instrument is in his handwriting ought to be received.

" 'Such evidence is not only proper for the jury, but of great importance upon the issue to be determined'. Hancock v. Snider, 101 W. Va. 535, 540, 133 S. E. 131, 133.''

This rule is now embodied in the latest editions of such works on Evidence as Greenleaf, Chamberlayne, Elliott, and Wigmore: Wigmore on Evidence, vol. 1 (2nd Ed.) sec. 112, and vol. 3, Id., secs. 1735, 1736; 4 Chamberlayne on Evidence, sec. 2649; 1 Greenleaf on Evidence (16th Ed.) pp. 57, 81, 261. In a note to section 112 of Wigmore, the author discusses at length the leading case of Hoppe v. Byers, supra; and numerous other decisions adopting a parallel doctrine are discussed, and the case of Throckmorton v. Holt, supra, which is committed to a different rule, is criticized as being against the weight of authority and as "a lonesome decision."

Common reason would dictate that declarations of a testator as to the contents of his will, or how he intended that his property shall descend at the time of his death, standing alone, are not admissible as direct evidence to prove or disprove the genuineness of the will; but that in all cases where its genuineness has been assailed by other proper evidence, declarations are admissible as circumstances either to strengthen or weaken the contention that the instrument is genuine. The weight to be given such evidence is for the court or jury—under our procedure, the court, as it is the tryer of the facts in such cases. That such declarations are of a very persuasive character and may often throw appreciated light on a doubtful issue, cannot be doubted. The fact that they may be manufactured, the strongest point against their admission, goes to the weight and not their admissibility.

In view of these considerations, and especially in view of the manifest tendency of the courts of to-day to enlarge and extend rather than to restrict the character of evidence that may be received, we prefer to follow that line of cases which hold that both the antetestamentary and posttestimentary declarations are admissible in corroboration of other evidence tending to render it probable or improbable that the paper, the purported will, is valid.

The second question is controlled by the case of In re Stire's Will, 92 Okla. 276, 219 Pac. 695, and rule therein announced, which is as follows:

"Where the probate of a will is contested, and the mother or next of kin is the plaintiff and the proponent is the wife and beneficiary under the will, she is incompetent under section 588 of Comp. Stats. of 1921, to testify as a witness to any material facts involved in the contest."

Proper objections were interposed to this testimony. Therefore, that part of Harry Creger's testimony concerning material facts pertaining to the execution of the purported will must be disregarded on the ground that he was not a competent witness to testify concerning these transactions. It follows then, for that reason that the cause must necessarily be reversed, unless there remains in the record sufficient competent tstimony of other witnesses to sustain the judgment, under the rules applicable on review of proceedings for the probate of wills.

In this connection, defendant in error contends that the case on appeal is to be governed by the rules applicable to appeals in purely actions at law, instead of actions in the nature of proceedings in equity; and that we can only look to the question whether or not there is in the record sufficient testimony to support the finding of the court, and that we are precluded from weighing the evidence. There is some sup-

port for that contention found in two Oklahoma cases, one a reasonably recent one. However, the overwhelming number of decisions by this court, rendered before and after the rendition of these two particular cases, definitely declare the opposite rule. These two cases relied upon by defendant in error are In re Stire's Will, supra, decided in 1923, and Benson v. Benson, 125 Okla. 151, 256 Pac. 912, decided in 1927.

In the case of In re Stire's Will, supra, on the particular point at issue, the Commissioner who prepared the opinion, in announcing the rule therein adhered to, fortified his position with citation of cases involving the review of purely legal actions. He did, however, cite two will cases as authority for the holding, but instead of being in support of the doctrine he announces, the cases, namely: In re Son-segra's Will, 78 Okla. 213, 189 Pac. 865; In re Me-hun-kah's Will, 78 Okla. 214, 189 Pac. 867, **expressly** announce the opposite rule.

The court, in the case of Benson v. Benson, predicated its ruling wholly upon the case of In re Stire's Will, supra, and decisions from the courts of California on the question,—quoting from the case of In re Newhall's Estate (Cal.) 214 Pac. 231, as follows, to wit:

"A finding on conflicting evidence that a holographic will was written entirely by testatrix will not be disturbed on appeal."

In California questions involving the contest of wills in proceedings to probate same, are properly triable before a jury, as a matter of right. Practically all, if not all, the reported cases from that state on the point show that jury trials were actually had in these cases. A jury trial was had in the case of In re Newhall's Estate, supra. It therefore logically follows that the question being triable by jury as a matter of right, the rules of review thereof should be and are the same as other actions at law.

It will be thus seen that the recent case of Benson v. Benson, supra, followed the case of In re Stire's Will, which declares, on this point, an erroneous doctrine; and also followed the rules of the California courts on the question, which rules are inapplicable to this state, because here jury trials are not accorded in contested will cases as a matter of right, and the question on appeal is governed by the rule applicable to purely equitable actions. McClure, Ex'r, v. Kerchner, 107 Okla. 28, 229 Pac. 598, and cases hereinafter cited.

The cases decided by this court after the decision in Re Stire's Will, supra, and announcing a contrary rule on this point, are as follows: McClure, Ex'r, v. Kerchner, supra; Richards v. Huff, 104 Okla. 221, 231 Pac. 76; In re Smith's Estate, 105 Okla. 218, 232 Pac. 399; In re Chopper's Estate, 112 Okla. 25, 239 Pac. 592; Lena et al. v. Patterson, Ex'r, et al., 113 Okla. 156, 242 Pac. 238; In re Tayrien's Will, 117 Okla. 216, 246 Pac. 400; Choate v. Tecumseh, 124 Okla. 55, 253 Pac. 996; In re Thomason's Estate, 115 Okla. 62, 241 Pac. 739; In re Dunlap's Will, 87 Okla. 95, 209 Pac. 651; In re Stover's Will, 104 Okla. 251, 231 Pac. 212. And the following cases were decided by this court subsequent to the decision in the case of Benson v. Benson: The cases are Youngblood v. Rector et al., 126 Okla. 210, 259 Pac. 579; Myers v. Myers, 130 Okla. 184, 266 Pac. 452. In the recent case of Youngblood v. Rector, supra, the rule is announced in the following language:

"Proceedings to admit a will to probate are in the nature of an equitable action, and on appeal this court will weigh the evidence, but will not reverse the judgment of the trial court unless said judgment is clearly against the weight of evidence."

It logically follows that these two cases relied on by defendant in error have been in effect overruled by this court.

This takes us to the main issue in this case—the factum of the will.

In matters pertaining to the execution of wills, the courts, as well as carrying out the dictates of the legislative bodies, have always been vigilant in impressing their judgments with their own convictions; and in doing this they have moved with caution as well as they have uniformly given considerable solemnity to the proceedings involving the admission of wills to probate. The principal reason for the importance attached to these proceedings is that these instruments are designed to vary and almost entirely supersede the established laws of descent and succession of property. The question of their validity, therefore, becomes of grave importance to the well-being of society and the administration of justice.

As the admittedly genuine writings of the deceased, which were introduced in evidence, together with the purported will, have all been certified for examination on review, this court will inspect these papers and make its own comparisons, and with the assistance of the other testimony will draw its own conclusions, giving due credit to the findings of the trial court on the

testimony of witnesses testifying before the court.

In the present case, we have carefully examined all the testimony offered by the proponent of the will and the testimony offered by the contestant, and in either excluding or including the testimony of Harry Creger, the proponent of the will (whose testimony under the law is incompetent), we are fully convinced that the purported will was not executed by the deceased, M. Creger, and that the will was a forgery. In view of the importance of the question, or the serious portent of the subject-matter, we deem it just to submit some of our major reasons for adjudging that the will is not genuine.

1. The circumstances surrounding the alleged execution and discovery of the instrument repel the assumption and theory that the will is genuine. In this connection, the testimony of Harry Creger, the proponent of the will, is entirely unsatisfactory. On cross-examination he qualified a considerable portion of his testimony relative to nearly every essential point. His testimony was indefinite and evasive. For instance, he says that he was in the house and about the premises and saw the will, or most of it, executed, and thinks he read only a part of it. He had written, for his father, the former or genuine will, but it seems that he gave the aged man no assistance in the preparation of this will in question—just thought he read a part of it. He further testified that he had told some other members of the family of the deceased about the will, but could not remember just which one or ones or when. Much of his testimony on first questioning was at variance with his testimony as recorded at the former trials of this case. When this testimony was called to his attention he would apparently reluctantly admit that he perhaps formerly testified as the record disclosed. After the death of his father he made a trip from Wellston to Edmond (where the will was later found) for no other business than to pay a telephone bill. Although he testified that he knew of the will from the day of its purported execution, April 7, 1917, and knew some of its contents, he failed to reveal such knowledge, or any part of it, to his sister, the contestant herein, but, instead, was asking her for $25 for aid in the funeral expenses of their father—was asking the disinherited to contribute.

2. The expressed friendliness of the deceased to his daughter, Mrs. Brooks, can-not be overlooked. He stayed with her the greater portion of the last months of his life. He was making his home with her at the time of his death. Where the financial condition of the heir or his ability to earn a livelihood is not out of proportion to that of the other heirs, certainly it would be unnatural for a father to disinherit the friendly and loving hand of filial relationship when he was the recipient of its hospitality.

3. In this connection it is interesting to note the recital in the purported will assigning the reason for the disinheritance. The reason given in the will for the disinheritance is that his daughter, Louisa, had refused to keep up the payments on the land. The exact language used in the alleged will is as follows: "I bequeath to my girl Louis who **refused to pay her part** on the land my wach."

In this connection it should be mentioned that as to Harry Creger, a matter of foremost consequence in this controversy was the fact that Mrs. Brooks had not made certain payments on the land or mortgage thereon. That matter seemed to be uppermost in Harry's mind—and that was written into the will.

4. The letters of the deceased, of which there are an abundance, reflect a spirit of loving kindness, instead of any bitterness toward any one, much less his children.

5. His conversations had a few months before his death with apparently disinterested persons reveal that he intended his property to be distributed equally among his children.

6. It is indeed strange that this aged man almost consumed by the ravages of time and almost palsied with the advance of years should prepare with his own hand so formal a document as his will, especially when his son Harry was present and who was somewhat an expert on the general law of wills. Harry was not a lawyer, but had given such attention to the law of wills and the law pertaining to the estates of decedents that he advanced an opinion as to what legal effect a codicil would have on the genuine incomplete will made by the decedent. As stated in the foregoing paragraph, he had written the former or genuine will of his father. In a letter to his sister, he stated as follows:

"I have the law governing wills, administrators, executors and inheritances, up to a scratch."

In his correspondence he freely discussed holographic wills, and he was "at home" with all these rather unusual and technical terms.

7. There are the physical characteristics of the will—the writing, the spelling, the use of names therein—directly at variance with the spelling, writing and use of names in the writings and oral speech of the decedent, covering a long period of years prior to his death.

(1) Taking the instrument by its "four corners," we find one of the devisees in the will referred to as his daughter "Nell". In the admittedly genuine writings of the decedent, he always referred to her and addressed her as "Nellie." It is hardly to be perceived that an old man in the evening of life would cease calling his daughter by the fondling, mellow-ending name of a lifetime, and apply a snappy abbreviation thereof, sounding in youth and nervous energy. By Harry Creger this daughter and sister was always or usually called "Nell" instead of "Nellie."

(2) In the purported will, the word "Comanche" is spelled correctly; and as shown by numerous genuine letters of the decedent, he invariably spelled the word with two M's as "Commanche."

(3) In the purported will, his son Harry is spelled "Harrie." In his genuine writing, he spelled the name correctly as "Harry."

(4) Harry Creger, the proponent of the will, in one of his letters spelled the word "signed" as "sincd." The latter spelling is used in spelling the word in the will. Among the genuine writings of the deceased, the word is used in its present tense and properly spelled.

(5) The word "my" appears in the will, and except as to the general angle, is clearly dissimilar to the other writing. That word appears to have been written by a person possessing a fairly good quality of penmanship, and not yet attained middle age.

(6) The decedent always used the old style "A" in the beginning of a sentence, and in the will the new style or small "a" is used.

(7) In every instance in the purported will, where the letter "s" was used at the beginning of a word or within a word, it is connected with the succeeding letter. This instance appears in the will about 16 times. In the writings of the deceased, which were conceded to be genuine, the letter "s" was never connected with the succeeding letter.

This instance appears nearly 100 times in his writings.

Regarding these indisputable physical facts appearing in the face of the document, the deductions therefrom are eloquently expressed in the brief of plaintiff in error, in the following language:

"These characteristics and discrepancies in the handwriting and in the spelling set forth above are evidence that cannot be discredited. These have no interest in the ultimate outcome of this litigation. They cannot be said to be biased or prejudiced, or to be influenced by their relationship to the litigants. Nor has any attempt been made to show that they do not speak the truth. On their face they reveal the habits of life of the proponent, and of the deceased. Unconsciously they proclaim the solemn truth that M. Creger did not write the purported will—that he could not have done so without going contrary to the principles of his nature, and without a revolution in the habits of writing developed and fixed during a period of nearly 70 years. There can be but one conclusion—some other than he did it."

What is said in the above paragraph is to a considerable extent applicable to the evidence and surrounding circumstances, not alone confined to the physical characteristics of the questioned document.

We have carefully considered the testimony of the experts or purported expert witnesses, that is, business men who gave testimony that in their opinion the instrument offered for probate was in the handwriting of the deceased. An analysis of this testimony so confidently relied on by the proponent of the will reveals that the principal witness based his conclusions solely on the features or form of the writing; and that he gave no credit to unaccustomed spelling and the use of unaccustomed names in the instrument. This witness drew his conclusions solely on the similarity of the script or the general form of the handwriting with his recollections of the handwriting of the deceased. Two of these witnesses were a variety of the expert on handwriting; that is, they were bankers or bank tellers in small towns. We are by no means depreciating the value of expert testimony to prove handwriting. In the notable case of Baird v. Schaffer, supra, from the Supreme Court of Kansas, which we have cited on another point, a bold forgery of a will was prevented from taking its intended spoils by giving due and proper credit to expert and opinion evidence in regard to the genuineness of handwriting. But this expert and opinion evidence must always bear

the qualification given it as a result of recent scientific investigation as is well stated in Mr. Osborn's "Problem of Proof," page 322, as follows:

"An editorial on this particular case, by Mr. W. A. Shumaker, in 'Law Notes,' vol. 21, No. 11, states: 'From this recognition of the possibilities of an expert examination has grown up **what may be now regarded as the prevailing rule, that the testimony of a handwriting expert will be given weight according to the reasons which he adduces in support of it.** As was said in Gordon's Case, 50 N. J. Eq. 397: "Handwriting is an art concerning which correctness of opinion is susceptible of demonstration, **and I am fully convinced that the value of the opinion of every handwriting expert as evidence must depend upon the clearness with which the expert demonstrates its correctness."** The experts have proved themselves fully able to meet the demands of this rule. * * *' " (Emphasis ours.)

The testimony and circumstances we have outlined in this opinion, we think completely and overwhelmingly overturn this opinion evidence offered in support of the will.

This is the second time that this case has been before this court for review. In this connection a statement by the above named author, in speaking of how these holographic wills and odd wills find their way into the courts, and the vigor with which they are prosecuted, is to some extent appropriate here:

"* * *. Strange to say, these cases go on repeating each other all over the land and are being soberly tried from day to day, and, sad to say, by the aid of perjury and prejudice, and the old restrictive procedure in some courts, and also in some measure because of the strange credulity of certain members of the legal profession, some of the 'rat's-nest,' 'dog-meat' wills are probated. The stories are not received with peals of laughter, as might be expected, but are listened to without a smile." (Osborn's "Problem of Proof," pp. 35, 36.

We are convinced that some other person than M. Creger wrote this purported will; and therefore the judgment of the trial court is hereby reversed, with directions to enter judgment denying probate to this instrument.

BENNETT, JEFFREY, HERR, and DIFFENDAFFER, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) 28 R. C. L. p. 402; 4 R. C. L. Supp. p. 1822; 5 R. C. L. Supp. p. 1535. See "Wills," 40 Cyc. p. 1284, n. 21; p. 1285, n. 26; p. 1313, n. 15; p. 1358, n. 75; "Witnesses," 40 Cyc. p. 2266, n. 82.