# CHARLESTON.

LENA E. MAXWELL *v.* LULA C. FORD *et al.*

(No. 5781)

Submitted January 19, 1927.   Decided February 1, 1927.

1.   WILLS—*On Issue of Devisavit Vel Non, Deceased's Declarations Are Admissible in Connection With Direct Testimony.*

 Upon an issue of *devisavit vel non,* evidence of declarations of the deceased may be received in connection with direct testimony supporting or discrediting the testamentary paper. (p. 127).

 (Wills, 40 Cyc. p. 1313.)

2.   SAME—*On Issue of Devisavit Vel Non, Evidence of Material Circumstance Tending to Render it Probable or Improbable That Paper is Valid is Admissible.*

 Upon such issue, evidence of any material circumstance or state of affairs which tends to render it probable or improbable that the paper is valid, is admissible.   (p. 127).

 (Wills, 40 Cyc. p. 1284.)

3.   SAME—*On Substantial Proof of Genuineness of Testamentary Paper, Dissimilarities Between Characters and Usual Handwriting of Deceased do Not Alone Discredit it.*

 Where there is substantial proof that the testamentary paper is genuine, dissimilarities between some of the characters of its writing and tnose of the usual handwriting of the deceased, are not alone sufficient to discredit the paper, if it is otherwise above suspicion.   (p. 129).

 (Wills, 40 Cyc. p. 1285.)

4.   APPEAL AND ERROR—*On Trial by Court in Lieu of Jury, Admitting Illegal Evidence is Not Material Error; on Appeal in Case Tried to Court in Lieu of Jury, Inquiry is Whether Sufficient Competent Evidence is in Record to Sustain Decision (Code, c. 77, § 30).*

 When an issue is tried by the circuit court in lieu of a jury, the introduction of illegal evidence is not a material error. The inquiry in this court will be, is there sufficient competent evidence in the record to justify the decision of the lower court?   Pts. 3 and 5, Syl., *Nutter* v. *Sydenstricker,* 11 W. Va. 535.   (p. 130).

 (Appeal and Error, 4 C. J. §§ 2853, 2982.)

 (NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

WOODS, JUDGE, absent.

Error to Circuit Court, Randolph County.

Will contest between Lena E. Maxwell, proponent of the alleged will of George H. Crawford, deceased, and Lula C. Ford and another, contestants. After rejection of the will by the probate court, the circuit court on appeal rendered judgment for the proponent, and the contestants bring error.

*Affirmed.*

*Talbott & Hoover* and *H. G. Kump,* and *Fred O. Blue,* for plaintiffs in error.

*D. H. Hill Arnold* and *Spears & Irons,* for defendant in error.

HATCHER, PRESIDENT:

This appeal involves the validity of a document offered for probate as the holographic will of George H. Crawford. The instrument is as follows:

"9/27/25   6 P. M.
My last will and orders. All my estate with love and honor to Lena E. Maxwell. Follow her instructions in funeral arrangements.
Geo. H. Crawford."

Crawford was a business man who lived in Elkins, W. Va. He was taken to a hospital in Baltimore, Md., on Sept. 28, 1925, where he died Oct. 3. His death was caused by pernicious anemia, from which he had suffered for several months prior.

The proponent, Lena E. Maxwell, is an unmarried woman of Elkins, to whom Crawford had been paying attention for a number of years, and for whom he professed great respect and affection. Crawford had stated to one witness, in the summer of 1925, that it was not his fault that he and the proponent had not married. In conversation with mutual friends, he would refer to her as "my lady." Shortly before leaving for the hospital, he asked Mrs. Deal (at whose home he roomed and boarded), "Why wouldn't a man leave his affairs to his lady when he has taken her time?"

The contestants, Lulu C. Ford and Myrtle C. Bently, are the sisters and sole heirs at law of Crawford. He had been embittered against them for a good many years before his death, and had stated that they would never get a penny of his money.

Crawford had been confined to his room for several weeks prior to his departure for the hospital. On the afternoon of Sept. 27, he made arrangements for the proponent to visit him at 7 o'clock that evening. Mrs. Deal suggested that because of his weakened condition, he permit Miss Maxwell to see him in his room. He rejected the suggestion, saying that he did not propose to give anyone a chance to talk about Miss Maxwell because of him. He remarked at the time that he had some writing to do. About 6 P. M. Mrs. Deal came into his room to remove his supper tray, and saw him writing something with a pen, at a small, crowded table. When Miss Maxwell arrived, she was shown to the living room, where Crawford joined her, remarking, ''You will have to excuse me for not having a necktie on. I was so nervous I could not tie it.'' Crawford gave instructions to Mrs. Deal that his conference with proponent was not to be disturbed.

Mrs. Deal, testifying as to Crawford's general condition prior to his departure for the hospital, stated that in the mornings he would be quite ill, around noon he would feel better, but by evening he would be very nervous and exhausted. Dr. McGill, senior consulting pathologist and diagnostician of the Davis Memorial Hospital at that time, who had Crawford under observation for about six weeks preceding his death, testified that Crawford was in a pronounced condition of anemia, with greatly lowered vitality, and that any concentrated mental effort produced such exhaustion, that it affected his muscular control. He also testified that he had advised Crowford, shortly before his departure for the hospital, of the seriousness of his condition, had told him that his business affairs should be closed, and that Crawford had said he would do so.

When the news of Crawford's death reached Elkins, friends of his communicated with Miss Maxwell concerning funeral

directions, and she stated that instructions from him would be found in the top of his trunk. Crawford had locked his trunk and taken the key with him. The friends broke open the trunk, but had hardly commenced the search when information came that Crawford's sisters had claimed the body, and the search was discontinued for the time. No further examination was made until about nine days later, during which time the room was kept locked, when the document in question was found in the trunk by R. H. Allen, the curator of Crawford's estate. The will was enclosed in an envelope addressed to "Lena," and was sealed with a 1924 Red Cross Christmas seal.

The document was rejected for probate by the county court of Randolph county. On appeal, no one requested a jury, and the circuit court of that county, proceeding under Sec. 30, Ch. 77, Code, decided that the paper was the true will of Crawford.

The only issue in the case is whether the instrument in question is the true will of Crawford. As this paper is not witnessed in manner prescribed by statute, its validity will depend upon whether it is written wholly in the handwriting of the decedent. The determination of this fact cannot be made to depend solely upon the opinions of witnesses or the opinion of the court upon a comparison of the document with other papers in the admitted handwriting of Crawford. Court after court has deplored the unsatisfactory nature of testimony as to the handwriting of a challenged paper; the reason being that witnesses of equal honesty and character and with equal means of information, testify both for and against its genuinenes. When the validity of an instrument is difficult to determine from testimony as to the handwriting as in this case, every collateral fact and circumstance which aids materially in solving the problem, should be considered. "There are cases involving questioned handwriting, the merits of which must be determined from circumstances outside of the writing itself." Osborn, Questioned Documents, 199. "In all such inquiries," says the Supreme Court of Pennsylvania, "great latitude in the admission of testimony

is neither unreasonable nor improper." *Brant* v. *Dennison* (Pa.) 5 Atl. 869 (871). In one of Freeman's notes, 107 Am. St. Rep. 461, that celebrated annotator, in discussing holographic wills, says: "While the law sanctions them, it leaves them dependent on the opinion of witnesses, as to whether the will is wholly in the handwriting of the testator, and where there is evidence on both sides of this issue, it would appear that declarations of a testator tending to either strengthen or weaken the probability that the instrument is in his handwriting ought to be received." "Such evidence is not only proper for the jury, but of great importance upon the issue to be determined." *Hancock* v. *Snyder*, 101 W. Va. 535 (540). *Johnson, etc.* v. *Brown*, 51 Tex. 65, and *Hoppe* v. *Byers*, 60 Md. 381, are cases parallel to this one. In each of those decisions evidence of the feelings of the decedent towards the parties interested in the probate of a holographic will was held admissible. *Throckmorton* v. *Holt*, 180 U. S. 552, is relied upon by counsel for contestants in opposing this holding. Because of the prestige of the Supreme Court of the United States, that case overshadowed for a while decisions of the state courts which took the opposite view. But it has not been followed to any great extent, and is opposed by the weight of authority. Wigmore On Evidence, Sec. 112, p. 353, (note); *State* v. *Ready*, 78 N. J. L. 601; 28 L. R. A. N. S. 240; *Aldrich* v. *Aldrich*, 215 Mass. 170; *Ewing* v. *McIntire*, 141 Mich. 517; *Manogle* v. *Parker*, 75 N. H. 143; Ann. Cas. 1912A 269; *Samuel* v. *Hunter*, 122 Va. 639; *Swope* v. *Donnely*, 190 Pa. 417.

We therefore hold that in connection with the testimony of witnesses as to the handwriting of the document, evidence is admissible of Crawford's declared feelings toward both the proponent and the contestants, as well as evidence of a state of affairs which would tend to render it probable or improbable that the paper is valid.

Counsel for contestants charge numerous errors to the trial court in the admission of testimony. This charge is not well taken. "In a case tried by a court in lieu of a jury it is not error in the court to hear illegal testimony, the court

being fully competent to discard such evidence.'' *Nutter* v. *Sydenstricker,* 11 W. Va. 535; *Wells-Stone Co.* v. *Truax,* 44 W. Va. 531.

As ''controlling circumstances in this case,'' counsel point to the fact that the paper in question is written in black ink, and claim that the checks and correspondence of Crawford for several months prior to Sept. 27, 1925, were written only in blue ink, with an occasional endorsement of ''Special'' on a check in red ink, and that no bottle of black ink from Crawford's room was introduced in evidence. Proponent offsets this argument by the evidence of the curator that *three* bottles of ink were found in Crawford's room, by entries made by Crawford in an account book on July 20, July 29 and Aug. 3, 1925, and by checks issued by him on July 27, Aug. 4; Aug. 12 and Aug. 24, 1925, all written in ink as dark as that of the disputed paper.

Counsel would discredit the document because no paper with the water mark of the document was found in Crawford's room. This point loses its force upon an examination of the standard exhibits filed, from which it appears that Crawford's letters, etc., were written on many different kinds of paper, evidently gathered by him at random. Counsel also overlook ''Maxwell Ex. 112A,'' which is an envelope addressed to ''Miss Lena E. Maxwell.'' This envelope is identified by the witness Barrett as one handed him by Crawford in Sept., 1925, to be delivered to the proponent. This exhibit is sealed with a 1924 Red Cross Christmas seal, and is the same kind of envelope, exactly, as the one containing the disputed document.

Counsel contend that certain dissimilarities between the handwriting of the questioned paper and the standard exhibits prove the paper spurious. In fact, they propose to stake their case on such dissimilarities. In making this challenge they have ignored the low esteem in which such evidence, alone, is held by many renowned authorities. One of England's most eminent judges, Sir. John Nicholl, was not extreme in condemning mere dissimilarities of handwriting as ''that weakest and most deceptive of all evidence.'' *Robson* v. *Rocke,* 2 Add. Ecc. 53.

A comparison of the paper with the standard exhibits shows that the writing, while not like Crawford's normal script, bears a close resemblance to the writing of certain exhibits, such as "Maxwell Ex. 112A". Some of the characters, however, are admittedly unlike the standards.

As was mentioned by the learned judge of the lower court in the opinion filed in this case, dissimilarities in some of the prominent letters are as much an argument in favor of, as against, the genuineness of the paper. It is beyond comprehension that a forger—and this paper is either genuine or a forgery—would attempt to imitate so closely the handwriting of Crawford in some places, and neglect imitation in such prominent letters, as the C in the signature, where the dissimilarities would at once attract attention. "It would be most unnatural for a party seeking to commit a forgery to adopt a signature unlike the genuine. Forgeries are usually committed by attempted simulation and facsimiles, and not by the adoption of a method unlike the usual signature of the one against whom the forgery is committed." *In re Williams,* 19 N. Y. Supp. 778. After stating that an abnormal condition of the writer always tends to produce distorted and erratic results, *Osborn, supra,* says: "Fraudulent writing is very seldom of this character, but shows a painful attention to details and a studied effort to produce a certain definite form and outline. * * * The forger does not dare write so poorly and in so broken and distorted a manner as results when one who writes with difficulty writes also under strain or excitement."

If the questioned paper was prepared at 6 P. M., Sept. 27, 1925, as it is dated, there is not only the evidence that Crawford was generally exhausted in the evenings, but his own statement made at 7 P. M. of the same evening, that he was so nervous he could not tie his necktie. Such extreme nervousness would certainly cause material departures from his normal handwriting.

Under the ruling of this court in *Nutter* v. *Sydenstricker, supra,* and *State* v. *Denoon,* 34 W. Va. 139, our inquiry here need only be, is there sufficient competent evidence to justify

the judgment of the lower court? By reason of McGill's advice to close his affairs, and Crawford's promise to do so, it would be natural for Crawford to have made his will. If the will was made in the evening, or after mental concentration, it would be natural for the handwriting to show the effects of exhaustion and nervousness. It was natural that Crawford should leave his property to one whom he loved, rather than to his sisters, against whom he was embittered. Owing to confinement to his room the locked trunk was a natural depository for an important paper. It was natural for Crawford to have told Miss Maxwell of the disposition in her favor, and where the will would be found. He must have done so, otherwise she would not have had the information that it was in the trunk. In fact, all the material circumstances and indirect evidence point to the validity of the testamentary paper. The most of Crawford's friends and business associates consider it genuine. The entire absence of a single fact or a circumstance indicating a forgery, lifts it above suspicion. The instrument itself bears marks of Crawford's authorship more characteristic than the writing —the expression of his esteem for the beneficiary and his solicitude for her good name.

We therefore find that the worldly goods with which he would have endowed "his lady" in life, have been bestowed on her in death, "with love and honor."

The judgment of the lower court is affirmed.

*Affirmed.*