## BARNETT v. BARNETT et al.

(Division A. Nov. 18, 1929.)

[124 So. 498. No. 27921.]

Geo. **T.** and **Chas. S. Mitchell,** of Tupelo, for appellants.

Bolton & Monaghan, of Tupelo, for appellees.

**McGowen, J.**, delivered the opinion of the court.

Lee Barnett and other heirs at law of J. A. Barnett, Sr., filed their bill in the chancery court against Charlie Barnett and Willis Barnett, the son and grandson, respectively, of the said J. A. Barnett, Sr., contesting the will of Barnett, Sr. An issue was made up by the court under the pleadings, and a jury was impaneled to try said issue. Two questions were presented by the issue: First whether or not the deceased, Barnett, Sr., was possessed of testamentary capacity on the date of the execution of the alleged will, March 26, 1927; second, whether or not the deceased, Barnett, Sr., was under the undue influence of Charlie Barnett and Vivian Barnett at the time of the execution of the said alleged will. After the proof for the proponents and the contestants of the will was all in, the court peremptorily instructed the jury to find for the proponents on both issues, and, judgment being entered thereon accordingly in favor of the proponents, the contestants appeal to this court.

One of the proponents, Charlie Barnett, named as executor in the will, petitioned the court to probate the will and presented with his petition the affidavits of the subscribing witnesses thereto, that the testator was of sound mind, of testamentary capacity, and that the will presented was the true last will of the testator, and that they, together with the testator, signed the instrument in the presence of the testator and of each other, and that they saw him sign the will. Thereupon, on the 19th day of May, 1928, the will was admitted to probate in common form. The testator died on May 17, 1928.

The evidence, so far as we deem it necessary to state, shows that J. A. Barnett, Sr., went to the office of Noel

Monaghan, an attorney at law, with a list of the names of his children and grandchildren, and asked him to prepare his will, reminding Monaghan that he and the lawyer's father were old friends. Under the terms of the will sixty acres of land north of Coonewah creek, in Lee county, Mississippi, were ordered to be sold by the executor and divided equally between his son Lee Barnett, his daughter Mattie Barnett, his daughter Mug Pettigrew, his daughter Emma Pettigrew, his grandson Curtis Barnett, his grandson Willis Barnett, and his granddaughter Birtie Pettigrew. The balance of the estate he devised and bequeathed to his son Charlie Barnett. The balance of his estate consisted of about one hundred fifty acres of land, a five hundred dollar government bond, and one thousand two hundred dollars on deposit in the bank. It was stated in the will that the testator had already given to two of his sons, T. B. and Jim Barnett, all that he considered proper, and that they were to take nothing under the will. It will be observed that these two sons are not contesting the will. By the terms of the will the proponent, Charlie Barnett, was given a major portion of his father's estate. Monaghan, the lawyer who drafted the will, Dabbs, a banker, and Spencer, a physician, the subscribing witnesses, all testified that the will was executed under circumstances indicating perfect freedom of mind on the part of the testator, and that he was at the time of sound and disposing mind and mentally capacitated to execute a will; that he knew his property, and how he wanted to dispose of the same; that he was a man of strong will and not easily influenced; and that he was seventy-nine years of age, but that, in their judgment, his mental faculties were not impaired.

It appears further that some weeks before this will was executed Barnett, Sr., had executed another will in exactly the same words, with the exception that the

lawyer, in drafting the will, had failed to state the county in which the land was located, and after the first will had been executed the lawyer became concerned about it, spoke to the physician, Dr. Spencer, and said he would feel better if the will was re-executed. Whereupon, on the 26th day of March, 1928, the testator reappeared in the lawyer's office and the will was redrafted, with the addition of the words "in Lee county, Mississippi," in precisely the same form as originally executed, and the old will was destroyed by the testator, and the same witnesses who were selected by the testator were present at this second execution of his will, and signed same as subscribing witnesses.

More than a score of witnesses testified to substantially the same facts as we have detailed above. "Squire" Sample, a justice of the peace, testified that the testator came to him some weeks before the execution of his will in the lawyer's office, and wanted the justice of the peace to write his will, and stated somewhat as to the disposition he wanted to make of his property, and said that Charlie and his wife Vivian, had been better to him than any child he had, and he wanted to do a better part by him. The justice of the peace told him he was busy, and requested that he come back at a later date.

For the contestants it is shown that the testator was seventy-nine years of age, and that his health had not been good. Some of the witnesses said that he had been feeble, and that he was forgetful, but there was nothing in their testimony to indicate that the testator was of unsound mind, save his age. He was shown to have gone about the community and visited his neighbors, and, by the contestants' witnesses, to have been a man of strong mind. Counsel for the contestants does not concede that a peremptory instruction should have been given on the question of mental capacity, but he does not argue, and there is no testimony to support the theory, that the

testator was mentally incapacitated to execute a will at the time of its execution.

The strongest testimony on the question of undue influence alleged to have been exerted by Charlie Barnett, the executor named in the will without bond and the principal beneficiary, and his wife, Vivian Barnett, was the testimony of Curtis Barnett, grandson. There was some other supporting evidence along the same line. Curtis testified that, on the day he understood the will was executed, Charlie Barnett said to him, when he went to the house for a bucket of water: "I been after Pa to go and make his will today, and he says he is not able, but is going just as soon as he gets able to attend to it; says he was not able; says he just now got out of bed." The witness testified that he (Curtis) went into the house about eight o'clock that morning, and that on that day Barnett, Sr., was in a feeble condition; to use his language, "he was pretty weak." About ten o'clock that day the witness said: "Charlie and Grandpa came by in the car and called me out to the road, asked me to go to town, said he was going to make his will, and said wanted me to go with them." This request was from the grandfather. Curtis said that he went to town with them, and saw Charlie assist his grandfather up the steps to Monaghan's office, and then he details this statement made by Charlie Barnett: "Charlie told me, says, 'I got Pa down here this morning to make his will just like I want it made,' and says, 'Let's keep it a secret from any of the rest of them,' and says, 'Pa promised me he wouldn't tell any of them, and if he told it, of course, the rest of them would try to break the will and have it divided.' " He said that Charlie stated that his father was going to give him the biggest part of it. He said that on January 29th of that year he got his grandfather to go with him to the bank to renew a note which his grandfather had signed for him (Curtis), and to use his

language, referring to his grandfather, "and he gets up and tells me about how they wanted him to make the will, Uncle Jim, Charlie and his wife, and says, 'If I have to make it that way in order to have some place to stay,' says, 'I hope and trust to God it is busted and divided equal.' " These are the strongest statements in the record tending to show undue influence. This witness further said that on the death of the wife of the testator, about two years before the execution of the will, at a family meeting, it was agreed that Charlie Barnett and his wife, who had no children, should move to the home of the testator, and live with him, and take care of him. He said, too, that his grandfather furnished the house and household necessities.

It is argued by counsel for appellant that this case should be reversed and remanded for another trial, because the evidence we have detailed here, offered for the contestants, is sufficient to authorize the jury to find that the will in question was executed by the testator while under the undue influence of Charlie Barnett and his wife. Taking it to be true that the testator made this statement attributed to him, as detailed above, and the statements of the testator at and before the execution of the will are competent, yet, as was held by this court in Sanders v. Sanders, 126 Miss. 610, 89 So. 261, they do not establish the fact or the truth of the issue, but only tend to establish that the statement was made by him. In Burnett v. Smith, 93 Miss. 566, 47 So. 117, 118, this court said: "A man of sound mind may execute a will or a deed from any sort of motive satisfactory to him, whether that motive be love, affection, gratitude, partiality, prejudice, or even a whim or caprice."

The statutes of Mississippi invest every person above the age of twenty-one years, regardless of condition, being of sound and disposing mind, with the power to dispose of his estate by will, and this right is one of

the most sacred to the citizens, and should not lightly be set aside. It will not be set aside upon mere suspicion or conjectures. It is true that the declarations of the testator, made at the time of, before, and after the execution of the will, are competent both on testamentary capacity and undue influence, Sheehan v. Kearney, 82 Miss. 688, 21 So. 41, 35 L. R. A. 102. But all the evidence surrounding this case indicates clearly that the testator herein was of sound mind and strong will, and this statement and like statements, taken alone, are not sufficient to establish undue influence in the light of all the other circumstances.

It is not even argued here that the will is unnatural and unreasonable by its terms. The testator had provided, in his lifetime, for two of his sons, and so stated; he took into consideration by his will the other members of his family, but gave the "lion's share" to the son with whom he lived—the one who was willing to live in his home in order to be with him and comfort, cheer him, and take care of him in his declining days. Shall we say that, because the favored son and his wife had an opportunity to influence him in their favor, the law then sets up undue influence? Most certainly not. The relations established between them were natural, and not strained, and it is not an unusual thing for one, when he comes to make his will, to remember those little evidences of love and affection and kindnesses shown to him, and respond by an enlarged provision for such a son, daughter, or relative.

Undue influence in the matter of executing a will must be the substitution of another's will for the will of the testator. This declaration merely showed a mental attitude, perhaps a regret that the relation established in his home made him appear partial by the terms of his will, or the best that can be said of the testimony is that he reluctantly executed the will. These statements mere-

ly showed mental attitude of the testator toward a party, and did not of themselves establish undue influence. There is nothing in the declaration attributed to the son Charlie Barnett, nor in the declaration of the testator, to show that Charlie Barnett dominated and controlled the will of his father, so as to overthrow the testator's will and substitute his own will therefor. However, this record shows that Jim Barnett, who was not given anything under the will, testified that his father told him that he had devised the lands in the manner in which the will shows that he did devise them, and that he wanted "Charlie to have this land," and pointed it out to him. Many deeds and binding contracts are executed by persons, fully competent and capable so far as mental capacity to execute a contract is concerned, reluctantly and even with regret, and sometimes with misgiving; but shall we say that, because a contract is executed under such circumstances, the other party to the contract shall lose the benefit of the same because it was reluctantly executed? Certainly not.

Giving these statements the weight to which they are entitled, they simply show a mental attitude, and do not establish anything upon which the jury could have based a verdict. In other words, if this case had been submitted to the jury upon this issue, the court would of necessity have been compelled to set it aside and not permit the verdict to stand.

It is clear that the testator in this case had exercised freely his right to select his lawyer to draft his will, the son of his friend; he selected his witnesses; he was in the office of the lawyer untrammeled, so far as this record shows; and he directed the lawyer as to what his property was, and upon whom he desired to bestow his favor, the objects of his bounty. Thus surrounded, he could have executed any will he purposed, placed the same in the hands of his banker friend, and there was

no one to say him nay. Afterwards he went again to more accurately describe the lands, and again he was untrammeled, and, so far as this record shows, uninfluenced, and shut in, with all the balance of the world excluded. If, after the execution of the will, he was not entirely satisfied with it, he gave no reason in the conversation attributed to him which indicated that his own will was not exercised, but only gave the reasons which prompted the execution of the will. These reasons may have been influential in making up his mind, but they were not unduly so.

There is nothing in this record upon which to base a judgment that undue influence was exercised upon the testator by any one in the execution of this will. See Sanders v. Sanders, 126 Miss. 610, 89 So. 261; Moore v. Parks, 122 Miss. 301, 84 So. 230; Scally v. Wardlaw, 123 Miss. 857, 86 So. 625; Estes v. McGehee, 133 Miss. 174, 97 So. 530.

Affirmed.