Lewis, Executrix, et al. *v.* Lewis, et al.

No. 41655        May 1, 1961        129 So. 2d 353

*Snow, Covington & Shows,* Meridian, for appellants.

*Thomas K. Holyfield, Gilbert & Cameron,* Meridian, for appellees.

KYLE, J.

This case is before us on appeal by Mrs. Bettye K. Lewis, proponent of an alleged holographic will of W. Jack Lewis, deceased, from a decree of the Chancery Court of Lauderdale County, rendered on September 8, 1959, in favor of Katherine Ann Lewis, an adult, and Mrs. Bess Lassiter Lewis, guardian and next friend of Margueritte Gibson Lewis, a minor, contestants, denying probate of said alleged will, which had been theretofore admitted to probate in common form.

The record shows that W. Jack Lewis lost his life by drowning in the Tombigbee River, near Demopolis, Alabama, on August 30, 1958; and that he left surviving him as his only heirs at law and next of kin, his wife, Mrs. Bettye K. Lewis, and two daughters by a former marriage, namely, Katherine Ann Lewis, an adult, and Margueritte Gibson Lewis, a minor of the age of 14 years. On September 26, 1958, Mrs. Bettye K. Lewis, the surviving widow of the deceased, filed for probate, a holographic instrument alleged and purporting to be the last

will and testament of the deceased, which was in words and figures as follows:

"9/26/57

"I, W. Jack Lewis, Leave To:

"Marge Lewis, Four Thousand Dollars

"Cash, in Trust of Julian Patrick

"as Distributor -

"To:

"Bettye K. Lewis, my wife, *all* My

"Estate, (Minus $4,000 above)

"W. Jack Lewis."

The handwriting of the deceased was proved by the affidavits of three witnesses, and the will was admitted to probate in common form by a decree of the chancellor signed on September 26, 1958. The decree also provided that letters of administration with the will annexed be issued to Mrs. Bettye K. Lewis, as administratrix C.T.A. upon the execution of a surety bond in the sum of $15,000, conditioned as required by the statute. The bond was duly executed and letters were issued to Mrs. Bettye K. Lewis on October 20, 1958.

On June 10, 1959, a petition for the contest of the will was filed by Katherine Ann Lewis and Mrs. Bess Lassiter Lewis, guardian and next friend of Margueritte Gibson Lewis, a minor. The petitioners alleged in their petition that the deceased had died intestate, and that the alleged holographic will which had been admitted to probate on September 26, 1958, was not the last will and testament of W. Jack Lewis, deceased; that said instrument was not testamentary in character and did not comply with the requirements of the statute governing the execution of a valid holographic will; and that said instrument was not wholly written by the said W. Jack Lewis, deceased. In their prayer for relief the petitioners asked that proper process be issued for Mrs. Bettye K. Lewis to appear and show cause why the alleged will

should not be suppressed and probate be denied; that a proper issue be made up for the contest of the alleged will; and that upon the final hearing the instrument be denied probate and be declared not to be the last will and testament of the deceased. Mrs. Bettye K. Lewis, proponent, filed her answer to the above mentioned petition, and in her answer denied that W. Jack Lewis had died intestate. In her answer the proponent averred that the instrument of writing as set forth above was wholly written, dated and subscribed by the said W. Jack Lewis in his own handwriting as a last will and testament. She denied that said instrument was not testamentary in character; she denied that said instrument did not comply with the statutory requirements for a valid holographic will; and she denied that said instrument was not wholly written by the said W. Jack Lewis, deceased.

By agreement of the parties, a special chancellor was appointed to try the case, and at the July 1959 term of the court an order was entered directing that a jury be drawn for the trial of the issues presented by the pleadings. The trial was begun on August 31, 1959, and was concluded on September 4, 1959. The jury returned a verdict against the will. The proponent filed a motion asking that the verdict of the jury be set aside and that a decree be entered sustaining the will notwithstanding the verdict of the jury or, in the alternative, that the verdict of the jury be set aside and a new hearing be granted. As grounds for said motion the proponent stated that the verdict of the jury was merely advisory, and was not conclusive upon the court; that the jury had mistaken the instructions given by the court; and that the verdict of the jury was contrary to the overwhelming weight of the evidence. The motion was overruled by the chancellor, and a final decree was entered adjudging that the instrument offered for probate was not the last will and testament of the deceased, and annulling the order admitting the same to probate in common form.

From that decree the proponent has prosecuted this appeal.

The record in the case shows that W. Jack Lewis was approximately 52 years of age and was engaged in the operation of an insurance agency in the City of Meridian at the time of his death. His business associate was Julian Patrick, who was the husband of his sister, Mrs. Margueritte Patrick. Mr. Lewis had been married to his second wife, Mrs. Bettye K. Lewis, approximately six years at the time of his death. His marriage to Mrs. Bess Lassiter Lewis, the mother his two children, had terminated in a divorce in 1951 or 1952. Prior to the filing of the suit for divorce by Mrs. Bess Lassiter Lewis, Mr. Lewis had executed an agreement dated June 5, 1951, by the terms of which he had agreed to pay to Mrs. Bess Lassiter Lewis the sum of $62.50 each month for the support of each of the two children until such child should attain the age of 21 years. He had also agreed to convey to the two children his undivided one-half interest in the residence property in the City of Meridian occupied by the family at that time. The record shows that the deed to the residence property was executed on June 29, 1951, and that the monthly payments for the support of the two children were made promptly thereafter, as provided for in the agreement. Katherine Ann had graduated from M. S. C. W. and was teaching school in the City of Denver, Colorado, when she received the news of her father's death. Margueritte Gibson was living with her mother, Mrs. Bess Lassiter Lewis, at the time of her father's death. The record shows that the relations between Katherine Ann and her father had been strained for a period of several years; but notwithstanding the strained relationship that existed between them, it appears that Mr. Lewis had visited her in her home when she was sick and had given her a watch on her 21st birthday.

According to the testimony of Mr. Lewis' sister, Mrs. Margueritte Patrick, the instrument of writing offered for probate was found in an inner compartment of a plastic wallet or billfold, which was delivered to Mrs. Bettye K. Lewis by an attendant at the funeral home in Meridian after the body had been brought to Meridian for burial. The wallet in which the alleged will was found was delivered to Mrs. Lewis in a sealed envelope which contained the personal belongings of the deceased taken from his pockets when the body was being prepared for burial. Mrs. Patrick stated that she saw the instrument in the home of her brother a few days after his death, when she and Mrs. Bettye K. Lewis were going through Mr. Lewis' personal effects. They found that there was a bulge in the middle of the wallet, which had been turned over to Mrs. Lewis at the funeral home; and when they examined the wallet they found the will in the inner compartment of the wallet. The paper was folded, the wallet was still moist, but the moisture had not penetrated the wallet to the extent that it would have if the wallet had been made of some other kind of material.

Eighteen witnesses, who were called to testify as witnesses for the proponent, testified that the instrument offered for probate was in the handwriting of W. Jack Lewis, deceased. These witnesses included a brother and two sisters of Mr. Lewis, who were familiar with the handwriting of the deceased, and former employees in the office of the Lewis-Patrick Insurance Agency, business associates and clients of the deceased, the treasurer of a lodge of which the deceased was a member, and the vice president of a bank in which the Lewis-Patrick Insurance Agency carried deposits of money, all of whom testified that they had known Mr. Lewis personally during his lifetime, that they were acquainted with his handwriting, that they had frequent opportunities to observe his handwriting and his signature, and that, in their opinion, the instrument offered for probate was wholly

written by Mr. Lewis in his own handwriting. The proponent also offered to prove by several of the witnesses statements made to them by the deceased during the several months immediately preceding his death to the effect that he had made a will and that he kept it in his pocketbook or billfold. The chancellor, however, excluded that testimony on the theory that the testimony was mere ''hearsay'', and therefore inadmissible on the issue of forgery of the will.

Against the testimony of this large number of witnesses who knew Mr. Lewis personally and were acquainted with his handwriting, the contestants offered the testimony of Mr. Lewis' former wife, Mrs. Bess Lassiter Lewis, who, as guardian of Mr. Lewis' minor daughter, was named as one of the two contestants, and the testimony of C. D. Brooks of Birmingham, Alabama, an alleged handwriting expert and examiner of questioned documents.

The appellant's attorneys have assigned and argued several points as grounds for reversal of the decree of the lower court. The alleged errors, stated in the order in which they occurred during the progress of the trial, are as follows: (1) That the court erred in sustaining objections to the testimony of several witnesses, who testified on behalf of the proponent, as to statements made by the deceased to the effect that he had a will and that he kept it in his pocketbook or billfold; (2) that the court erred in granting four instructions to the contestants which appear on pages 72, 74, 79 and 80 of the record; (3) that the court erred in refusing to grant two instructions requested by the proponent which appear on pages 87 and 88 of the record; (4) that the court erred in overruling the appellant's motion that the verdict of the jury be disregarded and that a decree be entered sustaining the will, or, alternatively, that the verdict of the jury be set aside and a new hearing be granted; and (5) that

the verdict of the jury and the judgment entered thereon is against the overwhelming weight of the evidence.

We shall consider first the assignment of error relating to the exclusion of testimony as to statements made by the deceased to the effect that he had a will and that he kept it in his pocketbook or billfold.

Miss Esther Whitley testified that she was an accountant for the Lewis-Patrick Insurance Agency, and that she assisted Mr. Lewis with his personal income tax returns; that she was familiar with Mr. Lewis' handwriting, and in her opinion the instrument offered for probate was in Mr. Lewis' handwriting. Miss Whitley was then asked whether in her dealings with Mr. Lewis she ever had any discussion with him concerning the disposition of his property at his death or the making of a will. Objection was made to the question. The jury was excluded from the courtroom, and in the absence of the jury, the witness stated that, while she was counseling with Mr. Lewis about the form of business organization the company should have, the matter of making a will was mentioned, and after a charter of incorporation had been obtained for the insurance agency she advised Mr. Lewis that he should make a will; that Mr. Lewis was in her office sometime thereafter, in December 1957 or January 1958, and she asked him whether he had done what she told him to do; and that Mr. Lewis patted himself on the hip pocket and said, ''Don't worry, I have got that taken care of right here.'' The court excluded the testimony.

Robert H. Duffell testified that Mr. Lewis wrote insurance for him for about 11 years; that he was acquainted with Mr. Lewis' handwriting; and that in his opinion the instrument offered for probate was in Mr. Lewis' genuine handwriting. He stated that he had seen Mr. Lewis' wallet or pocketbook several times; that, on or about the first week of August, just before Mr. Lewis' death, he was over at Mr. Lewis' house for a barbecue

supper and something came up about a will. Objection was made to the testimony of the witness concerning any statement made about a will, and the objection was sustained. The jury was excluded from the courtroom, and in the absence of the jury the witness testified that, after the barbecue supper, he and Mr. Lewis were sitting and talking, and Mr. Lewis said to him, "Bob, you ever had your will fixed up? * * * I have mine fixed up * * * I fixed it up myself." The witness stated that Mr. Lewis then pulled out his billfold and said, "I have got mine all right here, just like I want it."

B. M. Moon testified that he was the owner of a fabric shop in the City of Meridian; that he had worked with Mr. Lewis for a period of approximately two years as a real estate salesman in his office; that he knew Mr. Lewis' handwriting and his signature, and in his opinion the instrument offered for probate was in Mr. Lewis' handwriting. Moon was asked out of the presence of the jury whether Mr. Lewis had ever said anything to him about whether or not he had a will. Moon's answer was, "Several times prior to his death, Jack and I were in the office, and my wife and I had just made our wills * * * and I asked Jack about if he had made a will, or suggested that he might make one, that my wife might write it up for him. He said 'I have got mine right here in my pocket,' and he patted his billfold." Objection was made to the testimony, and the objection was sustained. The proponent offered to make proof of that same statement by Mrs. Moon.

■■■ We think the court erred in excluding the above mentioned testimony. When the validity of an instrument of this kind is questioned, as in this case, on the ground that the instrument is not written in the genuine handwriting of the alleged testator, ■■■ any evidence which tends to prove or disprove the existence of the will should be admitted; and many courts have held that the declarations of the testator that he had made a will and

that he kept it in a certain place are admissible, at least to corroborate evidence of the existence or nonexistence of the will in question. See Page on Wills, Lifetime Edition, Vol. 2, p. 482, and cases cited.

In one of Freeman's notes, 107 Am. St. Rep. 461, that celebrated annotator, in discussing holographic wills, says: "While the law sanctions them, it leaves them dependent on the opinion of witnesses as to whether the will is wholly in the handwriting of the testator, and where there is evidence on both sides of this issue, it would appear that declarations of a testator tending to either strengthen or weaken the probability that the instrument is in his handwriting ought to be received.

"Such evidence is not only proper for the jury, but of great importance upon the issue to be determined." See also Hoppe v. Byers, (1883), 60 Md. 381; Hancock v. Snider, 101 W. Va. 535, 540, 133 S. E. 181, 133; Maxwell v. Ford (1927), 103 W. Va. 124, 136 S. E. 777; In Re Johnson's Estate (1920), 170 Wis. 436, 175 N. W. 917; Rea v. Pursley (1930), 170 Ga. 788, 154 S. E. 325; In Re Creger (1929), 135 Okla. 77, 274 P. 30, 62 A. L. R. 690.

In Hoppe v. Byers, supra, where it was claimed that an instrument presented as a will of personalty was a forgery, the Court said: "It must be admitted that testimony as to handwriting, in any case of alleged forgery, though the best the nature of the case admits of, is usually the most unsatisfactory species of evidence courts of justice have to deal with. * * * The difficulty and doubt are increased in a case like the present, where the instrument alleged to be forged is set up as a will which takes effect only after death, and where a forgery, if committed, would surely (rarely) if ever, come to the knowledge of the party whose testament it purports or is said to be. It seems to us that in such a case every collateral fact and circumstance which is not clearly immaterial and irrelevant ought to be admitted, to aid the

jury in reaching the truth, which, after all, is the object of every jury trial.''

In the case of Maxwell v. Ford, supra, the Court held that upon an issue of devisavit vel non, evidence of declarations of the deceased may be received in connection with direct testimony supporting or discrediting the testamentary paper, and that, upon such issue, evidence of any material circumstance or state of affairs which tends to render it probable or improbable that the paper is valid is admissible. The Court also held in that case that, where there is substantial proof that the testamentary paper is genuine, dissimilarities between some of the characters of its writing and those of the usual handwriting of the deceased are not alone sufficient to discredit the paper, if it is otherwise above suspicion.

In the case of In Re Johnson's Estate, supra, the Court held that post testamentary declarations of the testator to the effect that he had made a will, and for the benefit of the proponent, were admissible in proceedings to probate the will, contested for lack of genuineness of signature. In its opinion in that case the Court said: ''It is well established that subsequent declarations of a testator are admissible to prove the existence or contents of a will alleged to be lost.  * * *  Being admissible on such issue, we see no reason why they are not equally admissible on the question here raised, as to whether the propounded instrument was the genuine will of deceased.''

In Rea v. Pursley, supra, the Court said: ''Probably the majority of the earlier cases are in harmony with Throckmorton v. Holt, supra (180 U. S. 552, 21 S. Ct. 474, 45 L. Ed. 663), but it has been suggested that this is due to the fact of the prestige of the Supreme Court of the United States, which rendered the decision in that case. In the later cases the correctness of the rule laid down in that case has been questioned and repudiated. Now the weight and trend of the authorities are in favor of the admissibility of declarations of an alleged testator,

both those made before and those made after the date
of the purported will, on the issue of forgery of the will,
where the issue is raised by other substantial evidence,
and proof of the declarations is corroborative of other
testimony.''

In an annotation on the admissibility of testator's dec-
larations upon the issue of the genuineness or due exe-
cution of a purported will, which appears in 62 A. L. R.,
698, 699, it is said: ''The apparent weight and trend
of authority, notwithstanding the contrary result was
reached in a decision in the Federal Supreme Court (see
III infra), is in favor of the admissibility of declarations
of the alleged testator (both those made before and those
made after the date of the purported will), on the issue
of forgery of the will, where the issue is raised by other
substantial evidence and proof of the declarations is
therefore corroborative of other testimony.''

The sole question presented for decision by the trier
of the facts in the case that we have here was, whether
or not the handwriting of the instrument offered for pro-
bate was the handwriting of W. Jack Lewis, deceased,
or a forgery. That issue was clearly presented in the
appellees' petition for the contest of the will. Each of
the three witnesses named above testified that in their
opinion the handwriting of the instrument offered for
probate was the genuine handwriting of the deceased;
and testimony relating to the declarations of the testator,
that he had made a will and that he kept it in his billfold,
was clearly relevant as tending to show the existence of
a will and to strengthen the probability that the instru-
ment offered for probate was in his handwriting, and
was also corroborative of the testimony of Mrs. Julian
Patrick to the effect that the instrument was found after
Mr. Lewis' death in the billfold which had been taken
from his pocket when the body was being prepared for
burial. We think the testimony relating to the declara-

tions of the alleged testator referred to above should have been admitted.

We come next to the assignment of errors relating to the granting of the contestants' instructions numbered 1, 3, 8 and 9, which appear on pages 72, 74, 79 and 80 of the record.

We have carefully examined each of the four instructions, and we think there was no error in the court's granting the contestants' instructions numbered 1, 3 and 8. But we think the court erred in granting the contestants' instruction No. 9 which appears on page 80 of the record, and which reads as follows:

### CONTESTANTS' INSTRUCTION NO. 9

"The court instructs the jury for the contestants, Katherine Lewis and Margueritte Gibson Lewis, a minor, by her guardian and next friend, Mrs. Bess Lassiter Lewis, that the burden is upon the proponent of the will to show by the preponderance of the evidence that the alleged will was wholly written and signed by W. Jack Lewis and if, upon the consideration of all the evidence in this case, you find that this burden has not been met and that it is uncertain and doubtful in your minds, whether the said W. Jack Lewis did wholly write and sign the instrument in question, then it is your sworn duty to find for the contestants and against the will."

For the court to say to the jury that, "if, upon the consideration of all the evidence in this case, you find that * * * it is uncertain and doubtful in your minds, whether the said W. Jack Lewis did wholly write and sign the instrument in question, then it is your sworn duty to find for the contestants and against the will", imposed upon the proponent a burden of proof far greater than that which the law imposed.

In Brown v. Walker (1892), 11 So. 724, the Court condemned an instruction given to a contestant which was

somewhat similar to the instruction shown above, and reversed the decree in favor of the contestant on account of the giving of that instruction. The Court in its opinion in that case, however, undertook to make what it called ''a true statement of the law applicable to the developed facts of the case,'' and in doing so made use of language very similar to the language used in the contestants' instruction No. 9 in this case. But that language has been condemned by this Court in at least two cases which have been decided by this Court during the last twelve years.

In Blalock et al. v. Magee, et al., 1949, 205 Miss. 209, 38 So. 2d 708, the Court affirmed the decree of the lower court, notwithstanding the fact that the lower court had granted an instruction by the contestant similar to the one that we have here. The Court, however, in its opinion in that case said, ''because of the risk of error to be incurred in trying to properly phrase an instruction containing such words as being 'left uncertain and doubtful', we think it would avoid the hazard of reversal incident thereto, in cases where too close issue of fact is involved, if a contestant in a will case or defendants in other civil cases should be content for their instructions on the burden of proof to go no farther than to advise the jury that the propopent or plaintiff is required to establish the issue by a preponderance of the evidence.''

In Wallace v. Harrison, 1953, 218 Miss. 153, 65 So. 2d 456, the Court again condemned the giving of an instruction similar to the above mentioned instruction No. 9 and in its opinion said: ''Appellants have assigned error on account of another instruction which the trial court gave at the request of the contestants. This instruction properly placed the burden of proof upon the proponents, but then added that ,''if upon consideration of all of the evidence in this case, the jury finds that this burden has not been met and that it is left uncertain and doubtful in your minds whether the said Emma Morgan was of

sound and disposing mind,' then you will find for the contestants. This form of instruction is not desirable as it tends to impose too great a burden on the proponents, although the Court declined to reverse on account of the instruction in Blalock v. Magee, 205 Miss. 209, 38 So. 2d 708.'' The Court then quoted the statement made in Blalock v. Magee which we have quoted above. The decree of the lower court in the Wallis case was reversed because of errors in the other instructions given to the contestants.

In Re: Rumley's Estate - Hillman v. Clayton, 1958, 234 Miss. 490, 106 So. 2d 678, the appellant complained of the granting to the appellees of an instruction similar to the above mentioned instruction No. 9, but the Court held that the giving of the instruction was not reversible error in that case.

The jury, after reading the contestants' instruction No. 9 in this case may have reasonably concluded that the instruction meant that they could not find for the proponent unless the proponent's evidence was sufficient to remove from their minds all doubt or uncertainty as to whether the will was a forgery. Any doubt, whether reasonable or not, and whether arising out of the evidence or suggested by the evidence, as to the genuineness of the handwriting was declared to be fatal. According to the court's definition of the term, ''to show by the preponderance of the evidence'', meant to show with absolute certainty, which was a higher degree of proof than that required to establish guilt in a criminal case. We hold that the giving of the instruction, under the facts disclosed by the record in this case, was error, and that it was such error as would require a reversal of the decree appealed from, even if there were no other reversible error in the record.

██ █ There was no error in the court's refusal to grant the two instructions requested by the proponent which appear on pages 87 and 88 of the record. The sub-

ject matter of those instructions had been fully covered by other instructions already given.

We come now to a consideration of the last two assignments of error which are based upon the court's action in overruling the appellant's motion that the verdict of the jury be set aside or disregarded, and that a decree be entered in favor of the proponent sustaining the will, notwithstanding the verdict of the jury, or, in the alternative, that the verdict of the jury be set aside and a new hearing be granted on the ground that the verdict and the judgment entered thereon were contrary to the law and the overwhelming weight of the evidence.

■■■ We think the verdict is against the overwhelming weight of the evidence and that a new trial should have been granted on that account.

In view of the fact that the case must be tried again, we shall not undertake to review the testimony of the witnesses in detail.

The only factual issue which the jury was called upon to decide was whether or not the instrument offered for probate was in the genuine handwriting of W. Jack Lewis, deceased. The witnesses who testified for the proponent as to the genuineness of the handwriting of the instrument were witnesses who had known the deceased personally for many years prior to his death and were personally acquainted with his handwriting. They were persons who had acquired their knowledge of his handwriting by their own observation of facts occurring under their own eyes. They included Mr. Lewis' brother and his two sisters, employees or former employees of the Lewis-Patrick Company, insurance policyholders to whom numerous policies had been issued by Mr. Lewis, and business associates who came in contact with him almost daily in the transaction of the business of the insurance agency. All of the above mentioned witnesses were positive in their opinions that the handwriting and signature on the questioned instrument was that of Mr. Lewis.

The only witnesses who testified against the will, as stated above, were the divorced wife of the deceased and the witness C. D. Brooks. The opinion evidence of Mrs. Bess Lassiter Lewis, as to the genuineness of the handwriting, we think, was of little probative value. The two main reasons given by Mrs. Lewis for her opinion that the handwriting of the purported will was not the handwriting of Mr. Lewis were, first, that the spacing between the lines were large, and, second, that the handwriting of the letters which she had received from Mr. Lewis many years before his death was smaller than the handwriting of the questioned instrument.

The witness C. D. Brooks testified that he first saw the instrument offered for probate, which was identified as Exhibit 2 to the testimony of Mrs. Lola Davis, on March 5, 1959, in the chancery clerk's office, and that he spent approximately four hours examining the instrument at that time. He also examined the signatures of W. Jack Lewis on several other instruments, which were admitted to be genuine. He made photostat copies of the signatures on several of the instruments which were admitted to be genuine. He made enlarged photostat copies of the several parts of the will offered for probate.

Brooks was then asked to state to the jury the conclusion he had reached and the facts and the circumstances which may have influenced his opinion on the question as to whether or not the instrument referred to as Exhibit 2 to the testimony of Mrs. Lola Davis was in the genuine handwriting of W. Jack Lewis, deceased. Brooks stated that he had compared an enlarged photograph copy of W. Jack Lewis' signature at the end of the alleged will with an enlarged photograph copy of Mr. Lewis' signature on the separation agreement signed by W. Jack Lewis and Mrs. Bess Lassiter Lewis on June 5, 1951, which provided for the support and maintenance of the two minor children, and an enlarged photograph copy

of Mr. Lewis' signature to the deed of conveyance executed by W. Jack Lewis on June 29, 1951, in which he conveyed to the two children his undivided one-half interest in the residence property in the City of Meridian, and an enlarged photograph copy of Mr. Lewis' signature to the typewritten letter which Mr. Lewis had written to Mrs. Bess Lassiter Lewis on August 23, 1956, concerning the making of repairs on the dwelling house; and the things which influenced his opinion most that the writing on the purported will was not done by the same person was that, while the design of the letters on the known instruments and their close shape and form and spacing were closely similar to that on the purported will, they were written more rapidly. Brooks said: "All of these writings were rapidly made, the lines were smooth, unbroken and evenly shaded, the upstrokes and down strokes were showed, and the rythmical pressure is normal to rapid writing, and they were equally rapid from one end of the writing to the other." Then referring to the purported will, Brooks said: "The writing on this document, in the signature as well as the rest of it, is all written slowly and that slowness is shown by the wavyness in the individual lines * * * and such wavyness, slight wavyness in the lines, did not occur in the known writings that I had * * *."

Brooks stated that, after making the first observation of the original document in the chancery clerk's office, he later examined the lines of the document meticulously, and made photograph copies of them, and that all through the writings, with the exception of a few terminal strokes which were written with considerably greater writing speed, he found that "the internal parts were all written slowly, with some irregularity in the use of the pen, in lifting it and replacing it in the middle of the w, for example." Referring to other parts of the document, Brooks said: "The speed with which the strokes were made by the pen movement across the paper were also

poor slow writing, not true writing but more drawing, because it was extremely slow, and the slowness extended from one end to the other." Brooks stated, however, that he did find "that the size of the letters, the large ones, particularly the shape and the angles, were very similar, closely similar to the writing on the known."

In further explanation of the reasons given by him for his opinion that the instrument offered for probate was not written by W. Jack Lewis, Brooks stated that in examining numerous writings of the deceased he had found a few differences in essential and significant characteristics in the body of the writing on the document which is Exhibit 2 to the testimony of Mrs. Lola Davis. He then exhibited an enlarged photograph copy of an address on an envelope postmarked March 31, 1944, which Mr. Lewis had mailed to his father-in-law, Mr. H. E. Lassiter, while he was in the Army in 1944, and an enlarged photograph copy of a return address on an envelope which Mr. Lewis had mailed to Mrs. H. E. Lassiter while he was in Mansfield, Ohio, in June 1948; and Brooks pointed out the dissimilarities in the letter "M", as it was written on the envelopes referred to, and the letter "M" which appears more than once in the purported will. Brooks stated that there was another significant difference between the writing on the purported will and the writing on other exhibits which he had examined, and that was that the "t" crosses or "t" bars which appeared on the purported will were not straight lines, as in the other exhibits, but lines having an irregular wavyness.

Brooks' testimony covers more than one hundred pages of the typewritten record. Brooks was questioned at length by the attorneys for the contestants, and was subjected to a rigid cross-examination by the attorney for the proponent. He admitted he had never known Mr. Lewis' handwriting prior to the time he was employed in this case. Brooks was finally asked this question:

"So you base your testimony chiefly that this is not Jack's will on the idea that it was written more slowly than some of these other documents, that is your chief contention, isn't it?" His answer was, "I would say that is the single most significant thing that I considered in reaching my conclusion."

We have made a careful study of the testimony of the witnesses. We have examined the questioned document and all of the other exhibits showing the genuine handwriting of the decedent, which the trial judge and the jury had before them; and we are fully convinced that the verdict of the jury in favor of the contestants is contrary to the overwhelming weight of the evidence.

■■ ■ The opinion evidence of Brooks was based entirely upon inferences from comparison of handwritings, and Brooks' testimony as a handwriting expert must be given weight according to the reasons which he has adduced in support of it. W. A. Shumaker in 21 Law Notes, 206. See also Anno. L.R.A. 1918D, 647, 648; Moye v. Herndon, 30 Miss. 110; Coleman v. Adair, 75 Miss. 660, 23 So. 369; In Re Rumley's Estate, 234 Miss. 490, 106 So. 2d 678. Those reasons, in our opinion, are not convincing.

Brooks admitted that the "single most significant thing" that he considered in reaching his conclusion that the will was a forgery was, that the will was written more slowly than the other documents which he had examined. Brooks seems to have attached little importance to the fact that Lewis was a layman unaccustomed to drafting legal instruments, and that the writing of a holographic will, whether the writer be a layman or a lawyer, involves much more serious thought and effort than the writing of a letter to a member of one's family while away from home. Even a lawyer, experienced in drafting legal instruments, would probably write "with extreme slowness" while engaged in drafting a holographic will which, among other things, included an item creating a

testamentary trust for the benefit of a minor child, as in this case.

Brooks laid great stress upon a few dissimilarities which he found to exist in the purported will, when he compared the same with the handwriting on letters which Lewis had written to his wife, or members of her family, while he was away from home during the 1940s. Brooks, as we have stated, made special reference to the dissimilarities in the letter ''M'' as that letter was written four times in the purported will, first, in the name of Lewis' daughter, ''Marge'', who was named as the beneficiary of a $4,000 trust, as compared with the letter ''M'' as it was written on the two envelopes in which letters were mailed by Lewis to Mr. H. E. Lassiter, his father-in-law, while he was in the Army in 1944, and to Mrs. Lassiter while he was in Mansfield, Ohio, in 1948. Yet Brooks admitted that the purported will was ''a very good copy'' of Lewis' handwriting ''in all respects except the speed of writing'', that it was ''all in all a better than average of the traced forgeries'' that he had encountered. In emphasizing the dissimilarities between the letter ''M'' as it appeared in the purported will, and the letter ''M'' as it appeared on the envelopes addressed to Mr. and Mrs. Lassiter, Brooks seemed not to realize that dissimilarities in some of the prominent letters of a writing in a case of this kind may be as much an argument in favor of, as against, the genuineness of the paper. Paraphrasing the language of the Court in Maxwell v. Ford (1929), 103 W. Va. 124, 136 S. E. 777, it is beyond comprehension that a forger - and this paper is either genuine or a forgery - would attempt to imitate so closely the handwriting of Lewis in some places, and neglect imitation in such prominent letters as the ''M'' in the name of Lewis' own daughter, Marge, where the dissimilarity would at once attract attention.

Brooks' opinion evidence, based upon the reasons given for it, we think, is entitled to but little weight

when considered in the light of other facts shown by the record. Slowness of handwriting in itself is no evidence of forgery; and the fact that the ball point pen used in the writing of the purported will may have been lifted from the paper from time to time before the words were finished, in the absence of more substantial proof, does not indicate that the writing is a drawing. The fact that minor dissimilarities in the writing may have been found when comparison was made with the handwriting in Lewis' letters addressed to members of his family ten or twelve years before his death, may indicate nothing more than nervousness, or a gradual deterioration in the handwriting due to advancing age. It is a matter of common knowledge that dissimilarities may be found in different specimens of the handwriting of the same person executed at different times and under different circumstances.  ▇▇ ▇ When there is substantial proof that the testamentary writing is genuine, dissimilarities between some of the characters of its writing and those of the usual handwriting of the deceased are not alone sufficient to discredit the paper, if it is otherwise above suspicion.

There is no proof of any collateral facts or circumstances in the record which might add weight to Brooks' opinion evidence that the instrument is a forgery. The instrument has all of the earmarks of being genuine. All of the surrounding circumstances and indirect evidence indicate that it is genuine. Lewis' brother, his two sisters and his business associates considered it genuine. There is nothing unusual about the disposition which Lewis made of his property by the will. Lewis had two children and a wife. He owed nothing to his first wife - they were divorced. He had educated the older daughter. She had a job as a teacher. Besides, they had been estranged for sometime. It was natural that he should bequeath his property to his wife and his minor daughter, who were the natural objects of his bounty.

The evidence in this case, as in Fortenberry v. Herrington, 188 Miss. 735, 196 So. 232, is so strong for the proponent and so weak for the contestants, that we feel it should be submitted to another jury. The appellant did not ask for a peremptory instruction at the close of the testimony. But the verdict, in our opinion, was against the overwhelming weight of the evidence, and the chancellor should have set it aside.

For the reasons stated above the decree of the lower court will be reversed and the cause remanded.

Reversed and remanded.

All Justices concur, except *Rodgers J.,* who dissents, and *Jones, J.,* who took no part.

RODGERS, J., Dissenting:

I am constrained to disagree with my astute colleagues upon the final result reached in this case. It is however apparent to me that the case should be reversed, because of erroneous instructions, and because of the refusal of the trial court to permit the introduction of certain admissible evidence, and I concur in that part of the majority opinion. I cannot agree, however, that this Court should substitute its judgment on the weight and worth of the testimony and hold the verdict to be against the overwhelming weight of the testimony. This is not a case in chancery where the Chancellor may disregard a verdict of the jury. This is a case where the law permits a jury to pass upon the validity of a will. Sections 508 and 1275, Miss Code 1942; 3 Am. Jur., Appeal and Error, Section 885, page 438.

It has been the rule in Mississippi for many years that a verdict rendered on conflicting evidence, will not be disturbed simply because the appellate court could have found otherwise, or may be of the opinion that it is against the preponderant weight of the testimony, unless the verdict evinced fraud, corruption or passion and

prejudice on the part of the jury; nor will the court reverse a case where there is sufficient evidence to justify the conclusions of the jury. It is only when the verdict and judgment of the trial court is unsupported by sufficient evidence that this Court may safely hold the verdict is against the great weight of the evidence.

The appellate courts have been tempted often to substitute the court's own opinion of the evidence for that of the jury as to the genuineness of disputed documents. In 3 Am. Jur., Appeal and Error, Section 884 reads: "The decisions are not in accord upon the question of the review on appeal of evidence as to the genuineness of disputed documents. In some instances the courts have refused to enter upon a comparison of the disputed handwriting with genuine writing for the purpose of setting aside the conclusion of the original trier of facts. However, in other cases the appellate court has been discovered to have made such comparison, sometimes agreeing and sometimes disagreeing with the decision of the original trier of the fact, sometimes holding that such trier erred in giving greater weight to the direct evidence in favor of the authenticity of the undisputed document than to the conclusions based on the testimony of experts, and sometimes rejecting such conclusions in favor of the direct evidence."

The question as to whether or not an alleged will was forged has been submitted to this Court in the case of Ellis v. Ellis, 160 Miss. 345, 134 So. 150, and the Court in that case refused to substitute its judgment for that of the jury. In that case the Court said: "The appellant next contends that the verdict of the jury was against the overwhelming weight of the evidence, and that consequently his motion for a new trial should have been sustained by the court below. We do not think there is any merit in this contention. The testimony bearing upon the issue as to whether the signature to the will was the genuine signature of George B. Ellis was in

sharp conflict, and there was ample testimony to support the verdict of the jury. It was peculiarly the province of the jury to pass upon this conflicting evidence, and the verdict cannot be set aside on the ground that it found no sufficient support in the evidence.'' See Kirk v. Kirk, 206 Miss. 668, 40 So. 2d 548; Wallace v. Harrison, 218 Miss. 153, 65 So. 2d 456; Lowrey v. Wilkinson, 222 Miss. 201, 75 So. 2d 643.

In the case of Liles v. May, 105 Miss. 807, 63 So. 217, where a question of forgery was submitted to the jury, a verdict was returned in favor of the contestants, and the Court said: ''On the evidence we think the cause was a proper one for the jury.'' In that case, however, one member of the Supreme Court dissented on the ground that he thought that the case should have been taken away from the jury.

This Court has uniformly held through the years that where there is a conflict of evidence the issue on a will contest, devisavit vel non, is an issue to be determined by the jury. Helm v. Sheeks, 116 Miss. 726, 77 So. 820; Tyson v. Utterback, 154 Miss. 381, 122 So. 496; Barnett v. Barnett, 155 Miss. 449, 124 So. 498; Woodville v. Pizzati, 119 Miss. 442, 81 So. 127; Isom v. Canedy, 128 Miss. 64, 88 So. 485; King v. King, 161 Miss. 51, 134 So. 827; In Re Alexander's Estates, 216 Miss. 26, 61 So. 2d 683; Rena v. Wells, 175 Miss. 458, 167 So. 620; Blalock v. Magee, 205 Miss. 209, 38 So. 2d 708.

In Watkins v. Watkins, 142 Miss. 210, 106 So. 753, the Court said: ''The conflicts in the testimony, however, were for the jury to pass upon, and, although we may not be entirely satisfied with their findings, we can not invade their province by setting aside this verdict which has been approved by the chancellor.''

This Court has held that when it becomes evident that the jury decided a will case against the overwhelming weight of the evidence, the appellate Court will grant a new trial. Fortenberry v. Herrington, 188 Miss. 735,

196 So. 232; Dabbs v. Richardson, 137 Miss. 789, 102 So. 769. In the Fortenberry case, supra, the Court said: "In conclusion, the case is so strong for the proponent, and so weak for the contestant, that we feel it should be submitted to another jury. The most reasonable and convincing, as well as the overwhelming weight of the evidence upheld the validity of the will, * * *''.

I do not believe the testimony in this case is so overwhelming that a new trial should be granted on that ground, because it is apparent to me that we are substituting our own opinion (from what we see in the record) for the verdict of the jury.

Did the jury have sufficient evidence on which to base its verdict? I think it did. The admitted writing of the deceased has been exhibited in long letters, checks, and notes. These exhibits show a precise even flow of up and down cursive pen strokes that glide and flit across the page, as gracefully as a butterfly in flight. The written line moves purposefully in a direct course across the page. The capital letter "J" has an even swing across the top in the form of a circle. The capital letter "L" has an unhesitating swing across the top and loops evenly to the left and at the bottom. Deceased made a loop and graceful swing to the left and under the capital letter "W" in his name.

Now look at the alleged will. The writing crawls across the paper, in a slow, hesitant, laborious manner of a caterpillar, stopping now and then to readjust its line of travel, and at one place even leaving its line of travel to start anew at a lower level. The letter "J" in the alleged will does not have the usual looping graceful swing at the top, but comes to a definite point to the right and at the top. The capital letter "L" does not have the graceful looping swing at the bottom and to the left, but is drawn slowly around to the left and down, ending in a thick stubby tail. The capital letter "W" in the alleged will no longer swings gracefully

down and under the letter, but it appears to have been drawn down and in a shaky uncertain stroke.

There are many exhibits in this record, and the jury may have come to their own conclusion from the exhibits alone; moreover the jury may have been aided in their verdict by the fact that the testimony tended to show that this case was a family affair, in which members of the family had not only become estranged, but hostile. The purpose of a part of the testimony introduced was to show a motive as to why the contest was instituted, but the jury could have very well considered this testimony as giving a reason and motive why a will could have been forged.

I cannot therefore agree that this Court should invade the province of the jury and pass upon the weight and worth of the evidence, and hold that the testimony is overwhelmingly in favor of the defendants. I would reverse the judgment of the lower court and grant a new trial permitting the introduction of the evidence erroneously rejected, and direct that the erroneous instructions should not be given in a new trial.