KIRK, et al. *v.* KIRK, et al.

In Banc. May 23, 1949.

(40 So. (2d) 548)

**Henry & Barbour,** and **L. J. Wise,** for appellants.

670

Bridgforth & Love, for appellees.

**B. B. Allen,** also for appellees.

**Hall, J.**

This suit involves the validity of an alleged last will and testament of C. W. Kirk dated March 16, 1946. Upon the trial on the issue of devisavit vel non the jury

found against the will and the beneficiaries therein have appealed.

The principal contention of appellants is that the evidence was not sufficient to warrant the submission of the case to the jury or, at least, that the verdict is so contrary to the overwhelming weight of the evidence that the cause should be reversed and remanded for another trial. This contention necessitates a summary of the evidence.

A large number of witnesses testified for both sides of the controversy and the record is too voluminous to quote in extenso. The evidence for the contestants discloses that the testator had no children, and his wife died before execution of the will here in question. In the last few years of his life he had become feeble and in ill health. He suffered a paralytic stroke about 1942 or 1943 from which he partially recovered, but the evidence shows that from that time on until his death in August 1946 his mind gradually deteriorated. In October 1945 he was placed in a hospital at Yazoo City; he tried to jump out of a window and was prevented by attendants from so doing; tall barriers were placed around his bed and he climbed over these and got on the floor underneath his bed, and stated that he preferred a hard bed like that, as it was the kind he slept on at home; he would strip off his clothes and walk the corridors of the hospital totally nude; he refused to use a bathroom or a bed pan to answer the calls of nature, and would use the bed or floor or any place he happened to be; he was so completely insane and ungovernable that the hospital authorities notified his relatives that he would have to be placed in a strait-jacket if they did not remove him from that institution, and they carried him to his home where he was attended by a nephew who had rented the place.

He remained there until March 12, 1946, and during that time he required the constant attendance of nurses; numerous witnesses covered this period in their testimony

and said he continually did and said things that were not normal; he would get up and wander about the house, did not want to be dressed, constantly soiled himself and would not use the bathroom; he could not carry on a coherent conversation and frequently failed to recognize people whom he had known for many years; he would express a desire to go home when he was already in the only home he had owned for many years; he was a very religious man and had for many years served faithfully on the board of deacons of his church, but during the months just mentioned he would fly into fits of temper and without provocation violently curse those who were trying to help him.

On March 12, 1946, the nurse who had been attending him night and day for several weeks desired a rest, and by agreement among his relatives the testator was on that day removed to the home of another nephew, George W. Kirk, Sr. On the following Saturday, March 16, he was carried to Yazoo City where a will was prepared and signed by the testator, by mark, under the terms of which his entire estate was left to the said George W. Kirk, Sr., and his wife. On this week-end the testator was carried to the home of his sister, Mrs. Cheatham, near Bentonia and on the following day, March 17, he became so violent that it became necessary to call a physician to quiet him. A son in law of Mrs. Cheatham was offered as a witness by the proponents and testified on direct examination that Mr. Kirk's mind was perfectly normal and he was competent to transact any kind of business, but upon cross-examination he admitted that the old gentleman was ''just raising hell,—whooping and hollering and going on'' and that nothing would satisfy him, the water didn't taste right, his pillow wasn't right, etc., and this witness went to Bentonia and telephoned George Kirk, Sr., to come and get his uncle, which he did. It was the opinion of many of the witnesses for the contestants that Mr. Kirk was never mentally competent after he went to the hospital in 1945.

There were two subscribing witnesses to the will. One of these was desperately ill at the time of the trial and was unable to testify. The other testified that he had known Mr. Kirk for about 50 years and that on the day when he was called in to attest the will Mr. Kirk was in a general run-down condition, did not enter into any conversation, did not speak to this witness and apparently did not recognize him; that the witness did not talk with the testator or ask him any questions, and, therefore, he would express no opinion as to his mental capacity. He also said that no request was made of him to satisfy himself as to the testator's capacity, and that one of the beneficiaries, George Kirk, Sr., was present at the time. Another person present at the time of execution of the will, but who did not attest the same, testified that the testator was of sound mind, that he called on all present to satisfy themselves as to the testator's mental capacity, and that George Kirk, Sr., was not present. Thus it is seen that there was a sharp conflict in the testimony of the two who were present when the will was executed.

The evidence for the contestants further shows that Mr. Kirk did not improve after the date of the will but that his condition gradually became worse until he died in August 1946.

The evidence for proponents of the will was to the effect that Mr. Kirk was mentally sound up until near his death except when he would have violent attacks such as above mentioned and after a careful review of the entire record we are of the opinion that there was sufficient evidence to justify submission of the case to the jury on the issue of mental capacity, and that the verdict is not contrary to the overwhelming weight of the evidence, and should not be disturbed.

In the case of Cox v. Tucker, 133 Miss. 378, 97 So. 721, which involved the contest of a will upon the issue of mental capacity, and other grounds, the evidence was conflicting, as in the case at bar, and this Court said: "Clearly this was not a case for a peremptory in-

struction for appellants, because there was evidence for as well as against the validity of the will.

"The only question presented is whether or not the verdict of the jury was against the overwhelming weight of the evidence. If it was, appellants should be granted a new trial. In a case where the evidence is conflicting and the verdict depends upon the weight to be given the testimony of the witnesses, and upon inferences to be drawn from the facts proven and the conduct of the parties in interest, a new trial will not be granted except for clear and manifest error in the rulings of the court, or where the verdict is against the overwhelming weight of the evidence. Wood v. Gibbs, 35 Miss. 559; Garland v. Stewart, 31 Miss. 314; Mobile & O. R. Co. v. Bennett, 127 Miss. 413, 90 So. 113. . . . The evidence in favor of the alleged will is very strong, while the evidence against its validity has many elements of weakness. But the latter cannot be said to be unbelievable. This court under the law has no authority to set its judgment up against that of the jury except for the purpose of determining whether there was sufficient evidence to support the verdict. It is the duty of this court where the verdict of the jury is against the overwhelming weight of the evidence to grant a new trial. However, we cannot say with perfect confidence that this is that kind of a case. We are therefore constrained to permit the verdict of the jury to stand."

██ There was also submitted to the jury the question whether the will was properly executed and whether it was obtained by undue influence, and the jury found against the will on both of these issues. It is unnecessary for us to review the propriety of submitting those issues to the jury for the reason that the verdict for contestants on the issue of mental capacity is sufficient to uphold the decree of the trial court. Sheehan v. Kearney, 82 Miss. 688, 21 So. 41, 35 L.R.A. 102; Blalock v. Magee, Miss., 38 So. (2d) 708, not yet reported in the State Reports.

Appellants assign error with reference to some of the rulings of the trial court pertaining to the admission of evidence, but we are of the opinion that if there was any error respecting such rulings the same was not prejudcial to the extent of requiring a reversal. The record as a whole shows that the Chancellor was liberal yet fair to both sides in the exercise of his control over the reception of evidence.

It is also contended that error was committed in the granting of four instructions to the contestants and in the refusal of five instructions for the proponents. We find that the appellants obtained fifteen instructions which covered every conceivable principle of law involved in the case, and the applicable principles in those which were refused were fully covered in other instructions which were granted to appellants. As to the four instructions granted to appellees which appellants contend were erroneous, these dealt primarily with the issues of legal execution of the will and undue influence, and were largely neutralized by instructions granted to appellants. Furthermore we find no error in the principles therein announced, and it is unnecessary for us to enter upon a discussion of these instructions since our affirmance is based upon the issue of mental capacity.

Affirmed.

**Montgomery, J.,** took no part in the consideration or decision of this case.