LEE, P.J.,
for the Court.
¶ 1. This is an appeal from a will contest from the Chancery Court of DeSoto County. The chancellor found that Isaac Crutcher, the decedent, had testamentary capacity to make a will both on November 25, 1991 and on March 29, 1995. Furthermore, the chancellor found that the decedent was not the subject of any undue influence, and, therefore, the will dated March 29, 1995, was the valid last will and testament of the decedent. The proponents of the will are the decedent’s great nieces Carolyn Newsom, the executrix, and Diane Mason Jones, and great nephew Isaac Dodson, all of whom are beneficiaries named in the will. The contestant, Rebecca Johnson, sister of the decedent, raises the following two issues on appeal:
I. THE CHANCELLOR ERRED IN FINDING THAT THE DECEDENT HAD TESTAMENTARY CAPACITY TO MAKE A WILL ON NOVEMBER 25,1991 AND MARCH 29,1995.
II. THE CHANCELLOR ERRED IN FINDING THAT THE DECEDENT WAS NOT THE SUBJECT OF UNDUE INFLUENCE IN THE MAKING OF THE WILLS.
*964 FACTS
¶ 2. Isaac Crutcher, a retired factory worker, departed this earth on September 5, 1996, at the age of seventy five. He left no surviving wife and had no children. Prior to 1989, Crutcher lived alone in a small house on approximately six-acres outside the town of Olive Branch, Mississippi. In 1989, Crutcher suffered a debilitating stroke that greatly impaired his speech and ability to walk. However, he was able to get around with the aid of a walker and often visited nearby neighbors and family by riding his riding lawn mower through the yards to their homes. Crutcher did not have a driver’s license, and he was illiterate. His business affairs had been tended to by his sister, Agnes Brown, and this practice continued after his 1989 stroke. He was also looked after by several of his sisters, nieces, and nephews who lived in the surrounding area. Various members of the family provided him with needed transportation, cleaned his house and clothes, and sometimes cooked for him.
¶ 3. On November 25, 1991, Crutcher executed a will in the law offices of Olive Branch attorney Wallace Anderson. Crutcher’s great-niece, Carolyn Newsom, along with her husband Ozell Newsom, provided him with transportation to and from Anderson’s office. The Newsoms lived next door to Crutcher on a one and a half acre plot that Crutcher sold to them after their marriage sometime around 1975. Carolyn, along with her mother, Dorothy Dodson, her brother, Issac Dodson, and sister, Diane Mason Jones, had been raised in Crutcher’s home from the time they were small children and testified that they looked to Crutcher as a father figure. Carolyn, who went to high school with Wallace Anderson, was ultimately responsible for recommending him to Crutcher for the purpose of making out a will. Before this meeting, Anderson had never met Isaac Crutcher.
¶ 4. In the 1991 will, Crutcher named his great-niece, Diane Mason (who later remarried and would add the name “Jones”), as executrix of his will. Under Section TV of the will, he bequeathed his brothers, E.B. Crutcher and R.T. Crutcher, “the right to live in my house as their residence for the term of their natural lives.” He also bequeathed all real and personal possessions, including the remainder interest in his house and land, to Diane Mason. The execution, which included Crutcher’s full signature, was witnessed by Wallace Anderson and Toni Luther, Anderson’s employee.
¶ 5. In 1993, Crutcher suffered another stroke or series of strokes, leaving him, according to testimony, mostly incapacitated. In 1994, after leaving a nursing home, Crutcher lived with his niece, Dorothy Dodson. She, along with Carolyn, assisted him with daily living. Dorothy and Carolyn also took over Crutcher’s business affairs from Agnes Brown. During this absence from his own home, Crutcher allowed his great-nephew, Isaac Dodson, to reside in his house.
¶ 6. In March of 1995, Crutcher met with Wallace Anderson to prepare a new will, and on March 29, 1995, Crutcher again met with Anderson to execute this will. Carolyn and her husband again provided transportation to Anderson’s office for Crutcher on both occasions.
¶ 7. The 1995 will named Carolyn as executrix of Crutcher’s estate. The will also divided Crutcher’s real property, the six acres of land, into three tracks comprised of two acres each. Carolyn New-som and Diane Mason were bequeathed two acres each. The will bequeathed to Isaac Dodson the house, two acres, and all remaining personal property located in and around the house, with the exception *965 of three items specifically bequeathed to other family members. These items included a rifle bequeathed to Agnes Brown, a garden tiller bequeathed to Ozell and Carolyn Newsom, and a riding lawnmower bequeathed to Dorothy Dodson. The will was signed with an “X” on all three pages, and witnessed by Wallace Anderson and his wife, Brenda Anderson.
¶ 8. Isaac Crutcher died on September 5, 1996. On February 24, 1997, Rebecca Johnson, Agnes Brown, and Lovie Cowans, sisters of the decedent, filed a motion for declaratory judgment in the Chancery Court of DeSoto County to declare the decedent’s last will and testament legally insufficient, and thus declare that Isaac Crutcher died intestate. On October 17, and December 13, 2002, a trial was held before Chancellor Dennis Baker. Testimony from family members attested to the mental capacity of the decedent and whether the decedent was unduly influenced. On December 30, 2003, the chancellor entered an order declaring that (1) Isaac Crutcher had testamentary capacity on November 25, 1991, and March 29, 1995; (2) Isaac Crutcher acted without undue influence in the making of the wills; and (3) the will dated March 29, 1995 was the last will and testament of Isaac Crutcher. A motion for reconsideration was denied on May 19, 2003. Rebecca Johnson now appeals the order of the chancellor.
ANALYSIS
I. DID THE CHANCELLOR ERR IN FINDING THAT THE DECEDENT HAD TESTAMENTARY CAPACITY TO MAKE A WILL ON NOVEMBER 25, 1991 AND MARCH 29, 1995?
¶ 9. Johnson asserts that the chancellor erred in finding that Isaac Crutcher had testamentary capacity when he executed both of his wills. Johnson bases her assertion on the direct testimony from herself and various family members who knew the decedent, saw him on a regular basis, and claimed that after his strokes in 1989 and 1993, Crutcher could not speak, talk, or conduct his own financial business. Johnson also entered into evidence various medical records of the decedent from six occasions where the decedent underwent various medical procedures and was observed by the same physician. On several of these forms, the physician, Dr. Kyle Creson, noted that in addition to suffering various physical ailments, he showed signs of “multi infarct dementia.” Dr. Creson also noted that Crutcher had even complained that he “had a change in mental status.” On one medical form, dated November 19, 1995, the doctor wrote that Crutcher had been “born with retardation,” and was assessed as having “moderate retardation.”
¶ 10. The proponents of the will offered testimony that Crutcher was fully capable of making a will on both dates. The witnesses admitted that Crutcher had serious physical ailments, including a severe slur, but countered that he was still capable of communication, that he was able to recognize visitors, and that he was well aware of the amount of property that he owned.
¶ 11. When reviewing the decision of a chancellor who has made findings regarding the credibility of witnesses and weight that is to be given to evidence, our role “is to determine if those findings are supported by substantial evidence, whether the chancellor abused his discretion, was manifestly wrong, or clearly erroneous, or whether he applied an erroneous legal standard.” Estate of Evans v. Taylor, 830 So.2d 699, 701(¶ 8) (Miss.Ct.App.2002); In re Estate of Mathis, 800 So.2d 119, 121(¶ 7) (Miss.Ct.App.2001).
*966 ¶ 12. This Court has previously addressed the analysis for establishing mental capacity of a testator:
[T]he test of one’s capacity to execute a will “is the ability of the testator at the time to understand and appreciate the nature and effect of his act, the natural objects or persons to receive his bounty, and their relation to him, and is capable of determining what disposition he desires to make of his property.”
In re Estate of Byrd, 749 So.2d 1214, 1217(¶ 11) (Miss.Ct.App.1999); Matter of Estate of Edwards, 520 So.2d 1370, 1372 (Miss.1988)(quoting Humes v. Krauss, 221 Miss. 301, 310,72 So.2d 737, 739 (1954)).
¶ 13. In this case, the chancellor heard testimony from family members as to Isaac Crutcher’s mental capacity. The witnesses, most of whom are possible beneficiaries and have a stake in the outcome of the trial, gave conflicting accounts of Crutcher’s mental state both before and after his strokes. However, while accounts of the decedent’s mental history provide us with a broad picture, we are mainly concerned with the decedent’s capacity at the time of the signing of the wills. Testamentary capacity “is to be tested as of the date of the execution of the will.” Byrd, 749 So.2d at 1217(¶ 11) (quoting Scatty v. Wardlaw, 123 Miss. 857, 878, 86 So. 625, 626 (1920)). Therefore, we shift our focus to the testimony surrounding November 25, 1991, and March 29, 1995.
¶ 14. The proponents of the will proffered the testimony of three witnesses who observed Crutcher on November 25, 1991. Carolyn and Ozell Newsom testified that they drove Crutcher to the law offices of Wallace Anderson that day and waited in the reception area while Crutcher and Anderson discussed the contents of the will. Anderson and an employee then witnessed Crutcher’s execution of the will.
¶ 15. The supreme court has held that “the testimony of subscribing witnesses is entitled to greater weight than the testimony of witnesses who were not present at the time of the will’s execution or did not see the testator on the day of the will’s execution.” Edwards, 520 So.2d at 1373. Here, the chancellor read deposition testimony from Anderson, a named defendant and the only subscribing witness to testify. He weighed that decision against testimony from the contestants, who, although were not with him the day of the execution, claimed that Crutch-er could not read or write and could not have signed his name on the will. The record is void, however, of any other proof that Isaac Crutcher could not have signed his name at that time. The proponents of a will “must prove the testator’s testamentary capacity by the preponderance of the evidence.” Id. at 1373. However, while the proponents may have to carry the burden of proof at trial, “the burden of going forward with proof of testamentary incapacity shifts to the contestants, who must overcome the prima facie case.” Id. The contestants only testified that they had never witnessed Crutcher signing his name. Since the proponents offered no other proof that Crutcher could not have signed his name prior to or on November 25, 1991, and since they could not prove that Crutcher was incapable of understanding the nature of the act, the persons receiving the bounty, and the disposition of his gift, the chancellor was correct, in lieu of the proof submitted, that Crutcher had the mental capacity to create a will on that date.
¶ 16. The 1995 will is more problematic. In 1993, Crutcher suffered a stroke or series of strokes that left him virtually immobile. According to testimony, Crutcher was confined to a nursing home for several months, after which he moved *967 into the home of Dorothy Dodson. Testimony revealed that Crutcher’s speech was greatly impaired, and that day to day chores, such as cleaning and dressing himself, required the assistance of his sisters, nieces, and great-nieces. There was also testimony that he had a difficult time feeding himself due to the impairment of his hands.
¶ 17. On two separate occasions in March of 1995, Carolyn and her husband again transported Crutcher to Wallace Anderson’s office. During the first meeting, the date of which does not appear in the record, Crutcher met with Anderson for several hours concerning the drafting of the will. On March 29, 1995, Crutcher met once again with Anderson to execute the will. Once again, Anderson was a subscribing witness. Anderson’s wife, Brenda, was also a subscribing witness, although she did not testify at the trial. Carolyn Newsom also testified that Anderson called her back to the inner office to observe the signing. Crutcher executed this will, however, with an “X” in the place of his signature.
¶ 18. The contestants offered into evidence Crutcher’s medical records from six dates ranging from April of 1994 to March of 1996. During these visits, Crutcher was admitted into the Eastwood Medical Center in Memphis, Tennessee, by Dr. Kyle Creson. While the purpose for the medical treatments were for various physical ailments, Dr. Creson noted in his evaluations on each occasion that Crutcher suffered from “dementia.” On three records, Dr. Creson even noted that Crutcher was “retarded” or had been “born with retardation.” However, only one record, dated April 10, 1994, was introduced that would have relevance to the decedent prior to the execution of the March 29,1995 will. Furthermore, this record only shows the medical status of Crutcher nearly one year before the will’s execution. Subsequent records only show Crutcher’s status eight months after the execution. No testimony was offered by either the proponents or contestants that Crutcher was retarded. In her own testimony on cross-examination, the contestant, Rebecca Johnson, even stated that she disagreed with Dr. Crutcher’s observation that her brother had been retarded since birth. Moreover, no expert testimony was proffered to support the proposition that Crutcher was incapable of making a will on March 29, 1995.
¶ 19. In support of her claim of incapacity, Johnson cites to the case of Kirk v. Kirk, 206 Miss. 668, 40 So.2d 548 (1949). In that case, the decedent suffered a debilitating stroke and his condition continued to worsen for several years until his death. The supreme court upheld the jury’s verdict that the testator did not have the capacity to create a will. However, the facts of Kirk are distinguishable from the case at bar. In Kirk, the decedent had a prolonged history of violent and eccentric behavior, and was confined to constant medical care. Kirk, 206 Miss. at 676, 40 So.2d at 549. At times, the decedent stripped naked and had threatened to jump out of a window. Id. The only subscribing witness testified that although the testator seemed calm at the time of the will’s execution, he never asked the testator any questions to ascertain the testator’s mental state. 206 Miss. at 678, 40 So.2d at 549.
¶ 20. In this case, however, the decedent showed no such signs of delusion. All family members attested to Crutcher’s slurring of speech and the difficulty of oral communication. However, physical incapacity does not render one incapable of making a will.
¶ 21. Even if the doctor’s observations were correct and Crutcher suffered *968 from dementia on the dates he visited the medical center, there is no proof that he lacked capacity on the day of the execution. It is generally accepted that even a person deemed “insane” may make a valid will during a period of lucidity. Gholson v. Peters, 180 Miss. 256, 267, 176 So. 605, 606 (1937). Though there is significant evidence that Isaac Crutcher was physically impaired, there is no evidence here that he was mentally incapable of making a will on March 29, 1995. Therefore, we hold that the chancellor did not err in finding that Crutcher had the mental capacity to make both wills.
II. DID THE CHANCELLOR ERR IN FINDING THAT THE DECEDENT WAS NOT THE SUBJECT OF UNDUE INFLUENCE IN THE MAKING OF THE WILLS?
¶ 22. Johnson asserts that Crutcher was unduly influenced by Carolyn and Ozell Newsom when he executed both wills in question. She bases her assertion by claiming Carolyn Newsom had a confidential relationship with Crutcher, that she and her husband chose their high school friend, Wallace Anderson, to prepare Crutcher’s wills, and that the Newsoms drove the testator to Anderson’s office when he executed both wills. Furthermore, Johnson argues that the proponents failed to prove by clear and convincing evidence that Crutcher was not unduly influenced by them.
¶ 23. Johnson claims that because of this confidential relationship between Crutcher and the beneficiaries, there is raised a presumption of undue influence. However, that is not necessarily the case.
A presumption of undue influence is not raised merely because a beneficiary occupies a confidential relationship with the testator; something more is required, such as active participation by the beneficiary in the procurement, preparation or execution of the will or mental infirmity of the testator. Croft v. Alder, 237 Miss. 713, 115 So.2d 683 (1959). In other words, there must be some showing that [the beneficiary] abused the relationship either by asserting dominance over the testator or by substituting her intent for that of the [testator].
Matter of Will of Wasson, 562 So.2d 74, 78 (Miss.1990) (quoting Matter of Will of Adams, 529 So.2d 611, 615 (Miss.1988)). Furthermore, the party who establishes the benefit of having a confidential relationship must clearly establish his entitlement through clear and convincing evidence. Norris v. Norris, 498 So.2d 809, 814 (Miss.1986). Whenever a will is contested, there is a presumption of undue influence where there is a confidential or fiduciary relationship. Mullins v. Ratcliff, 515 So.2d 1183, 1192 (Miss.1987).
¶ 24. Clearly, there was a confidential relationship between Carolyn and Crutcher as she helped him with his daily living and his financial affairs. In order for Carolyn to overcome this presumption of undue influence, the evidence must have shown by clear and convincing evidence that (1) she exhibited good faith in the fiduciary relationship with Crutcher; (2) Crutcher acted with knowledge and deliberation when he executed the wills; and (3) Crutcher exhibited independent consent and action. Murray v. Laird, 446 So.2d 575, 578 (Miss.1984), as modified in Mullins, 515 So.2d at 1193.
¶ 25. In determining whether Carolyn exhibited good faith in the fiduciary relationship with Crutcher, we find that there was no testimony that she mishandled any of Crutcher’s finances. Carolyn took over Crutcher’s finances from Agnes Brown sometime before the making of the *969 1995 will. Furthermore, according to testimony, Carolyn was close to Crutcher, grew up in his house, thought of him as a father figure, saw him on a daily basis, lived within close proximity of him, and physically tended to him.
¶ 26. We must also look at four other factors to help us determine whether Carolyn exhibited good faith: (1) the identity of the initiating party; (2) the place of execution and the persons present at the time of execution; (3) the consideration or fee for the will; (4) the party that paid for the will; and (5) the secrecy or openness surrounding the execution of the will. Matter of Will of Fankboner, 638 So.2d 493, 495-96 (Miss.1994). Carolyn testified that she suggested Crutcher make a will in 1991 in order that someone should inherit his land. After Crutcher asked her to choose an attorney, Carolyn chose Anderson partly because she knew him from high school and his office was nearby. As to the 1995 will, there was no credible testimony as to why Crutcher changed his will.
¶ 27. Both wills were drafted at Anderson’s office, away from Carolyn. Carolyn and her husband were present in the room when Crutcher signed his name with an “X” on the 1995 will. Both executions were observed by the requisite number of disinterested witnesses. In regards to payment for the drafting of the will, the record indicates that $100 was charged for the 1995 will; however, no witness kept records or statements for the payment. No witness could remember how the payment was procured. There was no record of payment for the 1991 will.
¶ 28. In determining whether Crutcher acted with knowledge and deliberation when he executed his wills, we look to see whether Crutcher was aware of his total assets and their general value; whether he understood who would receive his assets regardless of a will and how changing a prior will would affect the distribution; whether non-relative beneficiaries would be excluded or included; and the knowledge of who controlled his finances and how dependent upon or susceptible to that person he was. Murray, 446 So.2d at 579. Carolyn and Anderson testified that Crutcher spent several hours alone with Anderson. It does appear from the wills that Crutcher understood the nature of his property and who would be the beneficiaries. Crutcher knew how much property he owned and bequeathed specific items to members of his family, such as a rifle and a riding lawn mower. Although Crutcher depended upon others to manage his finances, we cannot find from the testimony that Crutcher lacked full knowledge and understanding of his actions.
¶ 29. In determining whether Crutcher acted with independent consent and action, we look for the advice of a competent person disconnected from Carolyn and devoted solely to Crutcher’s interest. Id. Clearly, Anderson as Crutcher’s attorney is most qualified to give that independent advice. Although Anderson was procured by Carolyn we cannot find that that in itself raises a red flag. Carolyn knew Anderson in high school and obviously thought he would be qualified to handle a matter such as this. In looking for an attorney, especially in small towns with seemingly fewer options, we fail to see how suggesting someone she knew is conclusive evidence regarding Carolyn’s intent. Anderson testified through deposition that at the time of the will executions he had no information concerning Crutcher’s property or heirs. Anderson also stated that the only persons in the room while Anderson was drafting the will were himself and Crutcher. Thus, Anderson received the information from Crutcher and was able to *970 draft two different wills according to Crutcher’s wishes.
¶ 30. In his opinion the chancellor found that Crutcher knew what he wanted to do with his property and executed both wills on his own volition. In looking at the record, the chancellor found that there was no undue influence exerted upon Crutcher by Carolyn. The chancellor was able to observe the witnesses and make his findings accordingly with which we are unable to disagree. There was no evidence in the record that Carolyn abused her relationship with Crutcher by exerting dominance over him. We find that this issue is without merit.
¶ 31. THE JUDGMENT OF THE DE-SOTO COUNTY CHANCERY COURT IS AFFIRMED. COSTS OF THIS APPEAL ARE TAXED TO THE APPELLANT.
IRVING, CHANDLER, BARNES AND ISHEE, JJ., CONCUR. BRIDGES, P.J., DISSENTS WITH A SEPARATE WRITTEN OPINION JOINED BY KING, C.J., MYERS AND GRIFFIS, JJ.